UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

                  -v.-                   :      S1 10 Cr. 709 (GBD)

ISAAK KHAFIZOV,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S  SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
           of America

Niketh Velamoor
Nicole Friedlander
Assistant United States Attorneys

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
UNITED STATES OF AMERICA                :
                                        :
            -v.-                         :        S1 10 Cr. 709 (GBD)
                                        :
ISAAK KHAFIZOV,                         :
                                        :
                    Defendant.          :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S  SENTENCING MEMORANDUM

On May 17, 2012, defendant Isaak Khafizov was convicted after a jury trial of four

counts of fraud arising from his operation of a fraudulent loan modification scheme.  With his

partners at American Home Recovery, Khafizov victimized vulnerable homeowners who were

struggling to make their mortgage payments, preying upon their fears of losing their homes.

Exploiting their desperation, Khafizov tricked the homeowners into paying up-front fees by lying

about miracle cures to their financial problems.  He told them that American Home Recovery

would quickly and dramatically reduce their mortgage rates, that the results were guaranteed, and

that he offered a money-back guarantee in any event.  Khafizov pretended it was all made

possible by Government programs that did not actually exist, by special, powerful relationships

with banks that he did not actually have, and by expertise and experience that he never

possessed.

Even though Khafizov knew that he would never deliver what he promised, the clients

who got nothing in return did not get their money back, because Khafizov and AHR had never

intended to return it.  On top of that, even after the company collapsed, Isaak Khafizov continued

to steal money from his victims.  He tricked some of them into giving him more money, falsely

claiming that it was going to the mortgage lenders when, in fact, Khafizov used their money to pay for his own credit card bills, his own mortgage, and his own Mercedes.  Worse, because he instructed them to stop paying their mortgages while they waited for the supposedly imminent mortgage modification, Khafizov's victims saw their homes fall into default and foreclosure as a result of his scheme.  As some of those people verged on losing their homes, and as they frantically filled his voice mail with pleas for help, Khafizov just shrugged them off, and then coolly recruited new victims, making the same false promises, telling them not to pay their mortgages, taking thousands of dollars in up-front fees, and lying when he promised he would solve their problems.  Once these new victims paid him, they never heard from him again.

In connection with the defendant's scheduled sentencing on March 12, 2014, in  its Presentence Report, the United States Probation Office calculates an applicable Guidelines range of 210-242 months' imprisonment, and recommends a sentence of 210 months' imprisonment. Probation's calculation was based in part on the applicability of two enhancements which the defendant believes do not apply, and the Government has determined not to contest.[1]  As a result, the Government believes that the applicable Guidelines range is 135-168 months' imprisonment. To reflect the seriousness of Khafizov's conduct, to promote just punishment and respect for the law, to protect society from this defendant, and to deter others like him, the Government respectfully requests that the Court impose a Guidelines sentence, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

I.      **The American Home Recovery Scheme**

The trial evidence showed that in mid-2008, brothers David and Jaime Cassuto and Isaak Khafizov started American Home Recovery, a company that targeted homeowners all over the

---

[1]      The Government has determined not to contest the enhancements for misrepresentation that he was acting on behalf of a government agency, pursuant to §2B1.1(b)(9)(A), and for abuse of a position of trust, pursuant to §3B1.3.

United States who were struggling to make their mortgage payments.  Through a series of lies, as set forth more fully below, American Home Recovery tricked these financially desperate people into handing over what little money they had by promising to convince their banks to "modify" their mortgages, meaning to reduce the interest rate and monthly payment on their mortgage.

In addition to being a founder of the business, Khafizov helped run it on a day to day basis.  He managed the sales team and he personally recruited many new customers.  Khafizov's salespeople and Khafizov himself told a variety of lies to customers in order to convince them to send money to AHR.   In addition, as set forth below, after AHR collapsed amidst a burgeoning investigation by the New York Attorney General's Office, Khafizov remained undeterred, recruiting new victims, and tricking other victims into paying him even more money, based on new lies.

A.      Khafizov's Lies to Victims

To trick people out of their money, both through AHR and after the company's collapse, Khafizov told the following lies, among others:

- AHR had a money-back guarantee;

- Victims had been "prequalified" or "preapproved" for a mortgage modification by their banks;

- AHR had special relationships and affiliations with their lenders;

- Government programs would make these mortgage modifications possible;

- Khafizov and AHR had experience and expertise in obtaining modifications;

- Victims were assured of particular results within particular short timeframes; and

- Victims needed to pay more money immediately because Khafizov was on the verge of completing a modification on their behalf, but the bank wanted money up-front.

### 1.     The Bogus Money-Back Guarantee

While Khafizov regularly enticed victims with the promise of a money-back guarantee, the trial evidence showed that he never refunded, and had no intention of refunding, anyone's money.  This was a crucial lie in the scheme; Khafizov was able to trick people with very little money into handing over what little they had by convincing them that they faced no risk in doing so.

Khafizov's partner in crime, cooperating witness David Cassuto, testified that from the inception of AHR, the Cassutos and Khafizov had no intention of giving people their money back and, in fact, that they did everything they could to avoid returning anyone's money.  (Trial Tr. 828-30.)  In addition, three separate victims testified that Khafizov and American Home Recovery either didn't give them a chance to ask for refunds - because the company disappeared into thin air – or that Khafizov and the company just kept stringing them along, coming up with any excuse not to give them their money back.

Vicki Tepper, a pet store owner from New Jersey, testified that Khafizov promised her a refund, telling her "there was no risk involved, that the money was 100 percent refundable."  (Tr. 459.)  But after she paid, she never heard from Khafizov again, and was unable to reach either him or the company.  (Trial Tr. 469.)  Similarly, victim Pankaj Singh, an immigrant who lived in Illinois and owned a home there, but moved to Georgia for a job, testified that Khafizov never gave him a chance to ask for a refund because Khafizov disappeared as soon as Singh paid his money.  Khafizov didn't answer his emails or his phone calls, and Singh never heard from him again. (Trial Tr. 92-92.)  The third victim, Dmitry Koledin, an immigrant who lives in Long

Island, testified that after Khafizov took $3400 in up-front fees from him, Khafizov began

ducking Koledin's phone calls.   (Trial Tr. 1263.)  After Khafizov accidentally picked up

Koledin's phone call and Koledin accused him of fraud, Khafizov falsely claimed that the

modification was forthcoming, and immediately sent Koledin a fake "pre-approval" letter that

falsely suggested Koledin's bank planned to agree to modify his mortgage.  (Trial Tr. 1267.)

### 2.      Bogus "Prequalification" by Banks

As shown in the example of Dmitry Koledin, Khafizov also lured in victims by falsely

promising that they had been "pre-qualified" or "pre-approved" to receive modifications from

their mortgage lenders.  As Cassuto testified, AHR never "prequalified" or "preapproved"

anyone, and this was nothing more than a trick to convince people to give them money.  (Trial

Tr. 819-20.)  Among those tricked by this lie was victim Vyvyenne Ngongang, an immigrant

from Cameroon who put her 5 children through college in the United States by working 90- hour

weeks as a personal care attendant for the physically and mentally disabled.  She testified that

Khafizov had her send him some documents, supposedly to see if she "qualified" for the 3%

interest rate he said he was offering, and then Khafizov called her the next day, saying,

"Congratulations, Vyvyenne.  I have good news for you.  You are approved for 3%."  (Trial Tr.

151).  Once she paid him money, she never head from Khafizov again, and he never returned her

any of her calls.  (Trial Tr. 155.)

Similarly, Charles Decker, a small business owner from North Carolina, testified that he

was "ecstatic" when Khafizov and others at AHR convinced him that his bank had prequalified

him for a mortgage modification, and that he paid the company thousands of dollars for that

reason.  (Trial Tr. 188.)  Not only was it a lie that Decker had been "pre-qualified," but

ultimately, because AHR advised him to stop paying his mortgage while he waited for the

supposedly pre-approved modification, Decker came to the brink of losing his home, where he lived with his wife and three children.  (Trial Tr. 192.)

Victim Bob McCarthy testified that Khafizov convinced him to pay up-front fees by sending him a letter that claimed McCarthy was "approved" for a modification from his particular bank, and that there were "approval terms."  (GX 800.)  The letter was bogus, and McCarthy never got a modification or his money back from American Home Recovery.  In fact, Khafizov and his employee stopped returning McCarthy's calls, McCarthy never heard from them again, and months later, as the evidence showed, Khafizov secretly stole over $2000 from McCarthy's bank account.  (Trial Tr. 1217.)

### 3.    Khafizov's Lies About Powerful Bank Connections

The evidence also showed that Khafizov repeatedly tricked victims into paying him thousands of dollars by lying about supposed powerful connections he had at their mortgage lenders. Tepper testified that Khafizov personally promised her that American Home Recovery was actually a part of her mortgage company, American Home Mortgage Servicing, a complete lie, as the Government showed through a stipulation at trial.  (Trial Tr. 458, 499.)  Similarly, McCarthy testified that Khafizov claimed (falsely, as Cassuto testified) that American Home Recovery had connections with various mortgage companies.  (Trial Tr. 1205.)

Victim Phyllis Logan, who worked at the U.S. Drug Enforcement Agency, testified that Khafizov tricked her into paying him $3000 immediately by pretending that he was meeting with a high-level executive of Bank of America.  According to Khafizov, this high-level executive said that if Logan would just pay that money, Bank of America would give her a modification. Khafizov told her to send him the money immediately, and said he would forward it to Bank of America.  (Trial Tr. 748.)  Logan sent the money, but Khafizov's story about meeting with Bank

of America was a lie.  As the evidence showed, Khafizov simply deposited Logan's money into
his shell company bank account, and spent it.

### 4.     Lies that Government Programs Provided for the Modifications

Khafizov and AHR regularly tricked prospective customers into paying up-front fees by
promising that the mortgage modifications were made possible by new Government programs.
The evidence showed that they told that lie in many ways, including through a fraudulent mass-
mailer that encouraged people to call a particular phone number (which, in reality, was AHR's
phone number, though AHR's name did not appear in the letter) to take advantage of mortgage
modification assistance supposedly made possible by the Government "Stimulus Act of 2008."
As a witness from the Treasury Department testified, this statement was false; the Stimulus Act
did not provide for mortgage modification assistance, and there was no federal mortgage
modification assistance program until sometime in 2009 (i.e., as American Home Recovery was
collapsing).  (Trial Tr. 131.)  Nonetheless, Cassuto testified that Khafizov liked this letter, and
wanted to mail it as quickly as possible, because it would trick people into thinking AHR was
affiliated with the Government, and that would help them get people's money.  (Trial Tr. 810.)
On top of that, Cassuto testified, Khafizov and Cassuto came up with a script for their employees
to use when talking to homeowners that falsely promised them that American Home Recovery
was affiliated with Government programs.

Multiple victims testified that they were tricked by AHR's deceptive letter, including
Marilou Perez, an immigrant from the Phillippines who is a nurse in the neonatal intensive care
unit at St. Barnabas Hospital in the Bronx; Jennifer Koontz, a young, single mother from
Maryland, and Pankaj Singh.  (Trial Tr. 78, 287, 503.)  All of them testified that they paid
American Home Recovery because they believed the statements in the letter, and because

Khafizov personally promised that the modifications were all made possible by the Stimulus Act. Two additional victims, Tepper and Koledin, testified that Khafizov promised them he would get modifications through new Government programs he was working with. (Trial Tr. 458, )  As the evidence showed, all of these promises were lies.

> 5.    **Bogus Claims that Khafizov Had Experience and Expertise, and that Victims Were Assured of Particular Results in a Short Time Frame**

As the evidence showed, Khafizov repeatedly lied to victims about his purported experience and expertise in obtaining mortgage modifications (which, in fact, was none) in order to induce them to give him money.   Ngongang testified that Khafizov told her he had been doing mortgage modifications for almost 7 years, and Singh testified that Khafizov claimed to have been a banker for ten years. (Trial Tr. 79, 149.)  As Cassuto's testified, however, neither Cassuto nor Khafizov had any experience doing mortgage modifications, and Khafizov had never worked as a banker. (Trial Tr. 820.)

The Government's evidence also showed that Khafizov falsely promised victims wonderful, very particular results in a very short time frame.   Cassuto testified that these promises were baseless, as the company was a failure from its inception, unable to obtain the promised modifications. (Trial Tr. 822-23.)  These lies had devastating consequences for the victims because, as the evidence showed, Khafizov and AHR instructed people not to pay their mortgage while they were waiting for a modification.  Victims accordingly stopped paying their mortgages, and many wound up in foreclosure as a result.

 Nearly every victim testified about these lies.  As examples, Koledin testified that Khafizov promised to lower his interest rate in 30 days; Tepper testified that Khafizov promised to cut her monthly payments in half in 3 months; McCarthy testified that Khafizov and his employee promised him an interest rate of about 4.25%; Koontz testified that Khafizov promised

to cut her mortgage payments from $2100 to $1500 in 3 months or less; and Pankaj Singh testified that Khafizov promised to reduce his mortgage amount by 60% in 3 months, a savings of hundreds of thousands of dollars.  (Trial Tr. 82, 458, 505, 1205, 1261.)

The Government showed the jury a timeline reflecting when Khafizov made those promises to victims to illustrate the egregiousness of these lies.  In particular, for example, in February 2009, American Home Recovery collapsed after its receipt of a subpoena from the New York Attorney General's office caused its employees to scatter.  By that point, the Government's evidence showed that Khafizov knew that, as a result of his terrible advice that they stop paying their mortgages and pay him instead, Perez, Koontz, Decker, Logan and McCarthy were all in default or foreclosure, and on the verge of losing their homes.  Many testified that at that time, they were calling Khafizov constantly, frantically, and that they were sending him their default and foreclosure notices.   But Khafizov remained undeterred.  As the Government showed, after that time, Khafizov personally recruited both Ngongang, promising to reduce her interest rate from 7% to just 3%, and Singh, promising to reduce Mr. Singh's mortgage by 60% in 3 months through the Economic Stimulus Act of 2008.  (Trial Tr. 82, 149.)  Of course, given the company's utter failure and collapse, Khafizov knew he was lying to Ngongang and Singh when he assured them of these results, as he had lied to so many others.  Indeed, as a witness from Singh's bank testified, Singh was completely ineligible for a mortgage modification because he was not living in the home that he was trying to get a mortgage modification on.  (Trial Tr. 117.)

B.    **Additional Fraud to Obtain Modifications**

While the evidence showed that AHR was a failure from its inception, it also showed that AHR made some effort to obtain modifications, particularly after it received the Attorney General subpoena for information about its practice.  But the evidence also showed that in doing

so, Khafizov simply committed additional fraud.  In particular, Tepper testified that Khafizov instructed her to lie about her income on a modification application to be submitted to her lender (Trial Tr. 464); Logan testified that Khafizov instructed her to lie about her expenses on her application; and Koontz testified that months after she submitted her application, Khafizov instructed her to sign a fake lease and pretend that she was receiving rental income in order to create the false appearance to her lender that she had more financial stability.  (Trial Tr. 549, 747.)  In this way, Khafizov further harmed his victims by trying to persuade them to engage in illegal activity with him.

### C.   Khafizov's Perjury at the Attorney General Deposition

In April 2009, the New York Attorney General deposed Khafizov in connection with its investigation of AHR, which had been the subject of numerous customer complaints both to the Attorney General and the Better Business Bureau.  During that testimony, Khafizov repeatedly and brazenly perjured himself, and he remained utterly undeterred by the experience, recruiting Ngongang as a new victim within days of testifying.

In particular, as introduced by stipulation at trial, at the deposition, an Assistant Attorney General asked Khafizov whether he advised customers to continue making mortgage payments on their homes while AHR was working on obtaining a modification on their behalf:  "Do you tell them whether to pay, to make payments?"  Under oath, Khafizov responded: "I advise all my clients to never stop making payments.  I don't want them to be in that situation."

As shown at trial, Khafizov's testimony was completely false.  Nearly every victim testified that Khafizov personally told them to stop paying their mortgage while they were dealing with the company.  McCarthy testified that Khafizov told him explicitly that McCarthy should stop paying his mortgage and pay AHR instead.  (Trial Tr. 1213.)  And Cassuto testified

that Khafizov and Cassuto specifically instructed employees that they should generally advise customers to stop paying their mortgages.  (Trial Tr. 823-27.)

As the Government argued at trial, the reason Khafizov lied to the Attorney General was no surprise: Khafizov knew that many customers had fallen into default or foreclosure as a result of his instructions, and he further knew that, at the very time he was testifying, they were calling him constantly, begging him for help because they were about to lose their homes as a result of his advice.   Accordingly, Khafizov lied under oath to the Attorney General, and then walked out of the deposition to recruit new victims, including Ngongang and Singh, advising both of them to stop paying their mortgages, and pay him instead.  (Trial Tr. 83, 153.)

Khafizov further perjured himself at the deposition, responding "no" when asked by the Assistant Attorney General whether he was "a principal, officer or director of any other company" besides AHR.  In fact, as shown at trial and set forth below, at the time, Khafizov owned and controlled a shell corporation, IF Management and Consulting, which had a bank account that Khafizov actively used at the time of the deposition to receive fraud proceeds from victims.

### D.    Khafizov's Outright Theft From Victims After the Collapse of AHR, and the IF Management Shell Company Account

As set forth above, the trial evidence showed that Khafizov continued the fraud in earnest after the collapse of AHR, the exit of his co-conspirators, the Cassutos, from the business, and the Attorney General deposition.  After AHR received the subpoena from the Attorney General, the company began to fall apart, and the Cassutos exited the business and thought they had an agreement with Khafizov that they would not take any more money from clients.  (Trial Tr. 867.) But Khafizov had no intention of quitting the scheme.  At that time, Khafizov began depositing money from victims (both new victims and increasingly desperate victims whom he tricked into

11

paying him again and again) into a bank account in the name of "IF Management," a sham entity that Khafizov controlled and used purely for criminal purposes, and the existence of which he concealed from the Attorney General, as set forth above.  Khafizov used the account as his personal piggy bank, using victims' money to pay his credit card bills, his own mortgage payments, and to make payments on his Mercedes and his Cadillac Escalade.

In particular, as the Government showed at trial, just ten days after the Attorney General deposition, Khafizov recruited Vyvyenne Ngongang, making her pay almost $1300 in up-front fees, which he deposited into his IF Management account, whereupon he never returned a call from Ngongang again.  (Trial Tr. 155.)  Three days later, Khafizov called Koontz, the single mother who was receiving foreclosure notices as a result of his fraud; Khafizov tricked Koontz into paying an additional $1200 on top of the $3000 she had already paid by claiming that AHR was doing so much work on her behalf (when in reality it was defunct).  (Trial Tr. 730.)  Three days after that, Khafizov stole money outright from McCarthy's bank account.  (Trial Tr. 1217.)  Less than a week later, Khafizov recruited Singh, pretending that he needed an up-front fee of $1295 in part for appraisal costs.   The following day, Khafizov told Decker that Khafizov was on the phone with Decker's bank, which had approved the modification and simply needed an additional $2,000, which Khafizov promised to forward to Decker's bank.  In fact, all of Khafizov's statements were lies, and he simply deposited each of these victim's money into his IF Management slush fund account, and spent it.

## II.    Sentencing Guidelines Calculation

The United States Probation Office (the "Probation Office") has calculated the defendant's offense level as follows:  a base offense level of 7, an increase of 14 levels because the loss is more than $400,000 but less than $1,000,000, an increase of 6 levels because the

offense involved 250 or more victims, an increase of 2 levels because the defendant misrepresented that he was acting on behalf of a government agency, an increase of 2 levels because the offense involved vulnerable victims, an increase of 4 levels because the defendant was an organizer or leader of criminal activity involving five or more participants, and an increase of 2 levels because the defendant abused a position of trust.  Based on these calculations, the Probation Office calculated a total offense level of 37.  PSR ¶¶ 51-63.  Probation has further calculated an applicable Guidelines range of 210-240 months.  PSR ¶ 95.

The defendant has objected to the enhancements arising from the loss amount, the number of victims, acting on behalf of a government agency, vulnerable victims and abuse of trust.  Ultimately, the defendant claims that the Guidelines range should reflect only the losses of the individuals who testified at trial, which would result in a total offense level of 19 and an applicable Guidelines range of 30-37 months.  (Def. Sub. at 35.)

### A.   Khafizov Victimized More Than 250 People, Resulting In Losses In Excess of $400,000

The defendant's base offense level should be increased (a) by 14 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the intended losses from the defendant's offenses exceeded $400,000 and (b) by 6 levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(C), because the defendant's offenses involved more than 250 victims.  Khafizov objects to these enhancements, making the improper contention that he should be held responsible only for the victims who testified at trial and for the losses that those witnesses incurred.   As set forth below, the evidence conclusively establishes that the defendant victimized far more than 250 individuals, and that the losses resulting from the defendant's offenses are, conservatively, significantly more than half a million dollars – again, well in excess of the $400,000 that triggers the 14-level enhancement.

To begin with, it is well-settled that loss need only be shown by a preponderance of the evidence, and that the court "need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (internal quotations omitted). A district court may make a reasonable estimate of loss, for example, "by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *Id.*

In order to assist the Court in determining the number of victims and the amount of losses that Khafizov should be held responsible for, the Government has reviewed and summarized a wide array of evidence including:

> (1) Trial testimony;
>
> (2) Statements made by victims during interviews conducted in the course of the investigation of this case, and in victim impact statements submitted to the Court in connection with sentencing[2];
>
> (3) Information from bank records for AHR and IF Management accounts, indicating payments to AHR and/or Khafizov; and
>
> (4) Evidence obtained from "ACT," AHR's electronic client database.

The Government has summarized this information in the Victim and Loss Spreadsheet, which is attached to this submission as Exhibit A. The Government has also provided, for the Court's review, an Appendix that includes items (1) and (2) that are listed above (specifically, the transcript of testimony by victims, and statements of victims as reflected in investigative

---

[2]     The Government submitted these letters to the Court by letter dated November 19, 2012 from the Victim Witness Coordinator for the United States Attorney's Office.

memoranda, notes taken by agents and prosecutors during the investigation, and victim impact statements) for each of the victims for whom such documents exist.[3]

In light of this evidence, and the other evidence offered at trial, the Government anticipates that an evidentiary hearing will not be necessary to resolve any question as to the applicability of the sentencing enhancements.

    **1.**    **The Court Should Find That There Were More Than 250 Victims**

        a.    <u>Individual Victims Who Communicated With The Government</u>

The Government has identified 84 victims who variously testified, have been interviewed by the Government, or have submitted personal statements regarding the impact of the defendant's fraud on their lives.  As mentioned, the transcripts, reports, notes and/or statements of these victims are included in the Appendix.  The information provided by these individuals and reflected in this documentation makes clear that they were in fact induced to pay Khafizov and/or AHR through fraud and are, therefore, victims of this offense.  The fact that the victims were interviewed by the Government (and, therefore, subject to prosecution if they lied) or reached out themselves to contact the Government strongly indicate the statements are reliable in their own right.   Moreover, the victims' accounts are remarkably similar not only to each other, but also to the trial testimony of several victims who were subject to vigorous cross-examination by defense counsel.  (*See, e.g.*, Appendix. at Tabs 2-85).  In particular, the victims offer similar descriptions of their interactions with Khafizov and/or AHR, in particular with respect to the lies that Khafizov and AHR told them to induce them to pay up-front fees.

---

[3]    The Government has not provided the actual bank records of ACT records (items (3) and (4) at this time, though the Government has summarized the relevant information from these records in the Victim and Loss Spreadsheet.  If the Court wishes to have the underlying records, all of which were made available in discovery, the Government will promptly provide them.

Reinforcing the reliability of many of these victims' statements is that the Government has uncovered bank records and/or ACT records that corroborate their claims to have been clients of, and to have made payments to, AHR and/or Khafizov.  *See* Victim and Loss Spreadsheet.  In many cases, the Government has identified bank records confirming the specific amounts that individual victims claimed to have paid AHR and/or Khafizov.  *See* Victim and Loss Spreadsheet.

> b.    <u>Other Individual Victims</u>

Apart from the 84 victims who communicated with the Government in some form, the Government was able to identify more than 400 additional customers of Khafizov and AHR by reviewing documentary evidence, including bank records and ACT records.  Of these individuals, we have found over an additional 200 who made payments to AHR and/or Khafizov, and over an additional 200 more for whom there were records in the ACT database.  At a minimum, for the reasons set forth below (namely, the overwhelming evidence that Khafizov and AHR induced people to pay up-front fees by telling them a series of lies), every individual who paid money to AHR or Khafizov as reflected in the bank records is properly considered a victim in this case.   Thus, the 84 victims who made statements to the Government or in victim impact letters, plus the over 200 additional people who are properly considered victims because they paid money to AHR and/or Khafizov, demonstrates that the number of victims in this case easily exceeds 250.  Notably, this figure does not even include any of the additional more than 200 individuals about whom information appears in AHR's client database.

Khafizov incorrectly argues that the Government has not presented "sufficient proof to support the conclusion that the entirety of AHR's clients were obtained through fraud"  (Def. Sent. Sub. at 20).  To begin with, the Government need not show that the entirety of AHR's

clients were obtained through fraud to surpass the 250-victim threshold.  Given that 84 customers have been confirmed as victims through testimony or interviews, the Government need only demonstrate that approximately 166 of the remaining 400 customers (i.e., less than half) were also induced through fraud.  Moreover, given the overwhelming evidence that Khafizov and AHR induced people to become customers through fraud, it is fair to conclude that all or virtually all of its customers were defrauded, let alone just 166 of the over 400 additional identified customers.

As set forth above in the summary of Khafizov's offense conduct, the trial evidence showed overwhelmingly that Khafizov and AHR induced clients to pay up-front fees through a wide variety of lies.  As Khafizov's co-conspirator Cassuto testified, Khafizov and Cassuto knowingly distributed AHR's fraudulent mass-mailer that deceptively mentioned the Stimulus Act and, a few days later, AHR's phones began to ring.  (Trial Tr. 813-14.).  Khafizov prepared scripts that AHR's phone representatives followed when talking to prospective customers, and those scripts also contained various lies, including lies about AHR's supposed government affiliation, relationships with banks, promised results within 30-60 days, and guaranteed refunds. (Trial Tr. 814.)

The testimony of 9 separate victims corroborated Cassuto's testimony,.  Victims described the lies the were told by Khafizov and AHR in detail, and their testimony was consistent with, and remarkably similar to, the statements of the scores of victims who have been interviewed by agents and/or who submitted victim impact statements in this case.  As the memoranda of interview make clear, every single victim was induced to pay AHR by at least one of the lies that were highlighted at trial.  Of course, all of this evidence makes sense, since no one would reasonably become a customer if Khafizov told them the truth, namely, that Khafizov and

AHR had no idea when or if they could obtain a modification for anyone at any time, but also had no intention of refunding anyone's up-front fees.

Notably, Khafizov and AHR knew that many of the things they were saying were lies from the beginning of the business. As the trial testimony demonstrated, AHR was not the first loan modification company that Khafizov and the Cassuto brothers operated. The first loan company they ran was Benjamin Modification Agency, which they subsequently changed to AHR. (Trial Tr. 794.) Even at Benjamin Modification Agency, it was clear to Khafizov and the Cassutos that loan modifications were anything but guaranteed in any timeframe, let alone the 30-60 days they promised. (Trial Tr. 822-23.) Nonetheless, Khafizov and AHR continued to make these false statements from the beginning of AHR, because they were needed to attract clients. (Id.) As the jury learned at trial, AHR was "a fraud from the very beginning." (Trial Tr. 934.)

Although conceding "a fraudulent method of solicitation in this case," (Def. Sent. Sub. at 20) the defendant asserts there "were clearly clients who hired AHR through legitimate conduits, such as referrals from other clients and prior contacts…." (Def. Sent. Sub at 20.) This argument is also unpersuasive. First, the defendant does not identify any particular clients or cite any evidence in support of this claim. In fact, the evidence suggests that there were very few, if any such clients. Of the victims who testified at trial, Koledin, who initially encountered the defendant in a coffee shop, is one of the only individuals who was referred in such a manner, and the interviews of non-testifying victims also indicates that most, if not all, were not personally referred. In any event, the mere fact that individuals were referred to the defendant or AHR did not mean that they were not subsequently induced to pay AHR through fraud. After meeting

Khafizov, Koledin, for example, was told many of the same lies that others were told before agreeing to part with his money.  (Trial Tr. 1261.)

Accordingly, given the clear evidence that Khafizov and AHR only solicited customers by lying to them, and that they had at least approximately 300 paying customers, it is appropriate to conclude by a preponderance of the evidence that all of these customers are victims in this case.   Therefore, the Government has established by a preponderance of the evidence that the defendant's offenses involved more than 250 victims.[4]

2.    The Court Should Find Losses Well In Excess of $400,000

The available evidence also demonstrates losses well in excess of $400,000.  First of all, the Government has identified actual losses suffered by the approximately 84 trial witnesses and other victims who have made statements in this case of approximately $230,000.  The Government has further identified additional actual losses of approximately $480,000 from AHR and IF Management bank records, namely, payments by customers to AHR and/or Khafizov. While the Court need only find that $170,000 of this money constitutes loss (since losses from the 84 other victims exceed $230,000), as set forth above, the Court may properly infer based on the trial evidence that all of these customers were fraudulently induced to become customers by Khafizov and AHR, and thus that all of this money constitutes loss.[5]

---

[4]      In fact, given that Khafizov's predecessor company, Benjamin Modification Agency, also had customers, given the possibility that Khafizov was involved in loan modification fraud after the demise of AHR that was not captured in the IF Management bank records, and given the likelihood that many of the over 200 customers identified in the ACT database for whom the Government has no corresponding bank records were also victims of this fraud, it is likely that the Government's estimate of at least nearly 300 individual victims understates the total number of people defrauded by Khafizov.

[5]      The defendant objects to any estimations of loss amount based on the nine victims who were "cherry picked" by the Government to testify at trial, but as set forth above, the Government can show actual losses incurred by 75 additional victims who made statements in

Notably, these totals do not even include the losses that were suffered by the approximately 200 additional victims identified by the ACT database and for whom no bank records were found.  Since it is exceedingly unlikely that AHR and Khafizov provided any services without first receiving up-front fees, it is reasonable to include them as paying customers even if specific bank records have not been located, especially given trial evidence indicating that Khafizov used an array of entities and bank accounts to carry out his scheme.

The defendant further claims that "there was also testimony and documentary evidence adduced which demonstrated that several clients who demanded refunds were given refunds" but, again, this argument is both factually and legally incorrect.  Although the Government is aware of rare instances in which refunds were given, the evidence in fact demonstrates that AHR never intended to give refunds and did so only in the rarest of circumstances.  Moreover, even if there were refunds, they would not reduce the loss amount for Guidelines purposes.  The Guidelines provide that the loss amount shall be reduced by money that is returned "before the offense was detected."  *See* U.S.S.G. § 2B1.1, cmt. 3(E)(i).  Crucially, however, the "time of detection of the offense" is defined as the earlier of the "time the offense was discovered by a victim or government agency" or the time that the defendant "knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."  *Id*.  That the defendant returned money to customers who complained about his fraudulent behavior does not entitle him to a reduction in the loss amount, because there is no adjustment where money is returned only after the discovery of the fraud.  *See, e.g.*, *United States v. Shenko*, No. 5:05-CV-00600, 2007 U.S. Dist. LEXIS 13044, *5-6 (N.D.N.Y. Feb. 6, 2007 ("There is no credit against a loss when payments are made after the detection of the offense.").  That makes

this case, and the trial evidence showed overwhelmingly that AHR and Khafizov were only able to convince people to pay them money by lying to them.

sense because the "purpose of the loss calculation under the Sentencing Guidelines is to measure the magnitude of the crime at the time it was committed. The fact that a victim has recovered part of its loss after discovery of the [crime] does not diminish a defendant's culpability for purposes of sentencing." *Id.*; *see also United States v. Swanson*, 360 F.3d 1155, 1169 (2d Cir. 2004) (defendant not entitled to discount where he repaid money to bank after bank detected the fraud). Accordingly, here, the defendant is not entitled to any discount in his loss amount based on monies allegedly refunded to customers.[6]

Finally, the defendant contends that there were "many who in fact received legitimate services and others who received modifications" and blames AHR's brokers, the mortgage lenders and even the clients themselves for those who did not get the promised modifications (Def. Sent. Sub. at 14, 20.) Again, this argument is both unsupported by evidence and is ultimately irrelevant. In reality, the evidence demonstrates that very few customers actually received modifications of any kind, that AHR was only able to obtain modifications by committing additional fraud, and the defendant cites no evidence to the contrary. In any event, whether victims ultimately got modifications is irrelevant, because individuals who were induced to pay based on false statements – as AHR's customers were – are victims irrespective of what happened to their applications. *See United States* v. *DiNome*, 86 F.3d 277, 284 (2d Cir. 1996) (definition of property includes right to control the use of assets; intent to defraud where defendant intends to deprive victim of information material to victim's decision on how to deal with assets); *United States* v. *Rossomando*, 144 F.3d 197 (2d Cir. 1998) (intent to cause harm to victim where defendant obtains loan by means of false information, notwithstanding intent to

---

[6]     The Government agrees, however, that the defendant is entitled to a reduction in his restitution obligation for any amounts refunded to clients, and will submit a restitution order that does not seek restitution for any amounts actually refunded to customers.

repay loan, because defendant intended to deprive lender of ability to accurately determine risk);

*United States* v. *Berkovich*, 168 F.3d 64, 66 (2d Cir. 1999) (same).

For these reasons, there is overwhelming evidence of losses in excess of $400,000.[7]

**B.      The Vulnerable Victim Enhancement Applies**

The defendant's base offense level should be increased by 2 levels because "the

defendant knew or should have known that a victim of the offense was a vulnerable victim...."

U.S.S.G. § 3A1.1 (b)(1).  The enhancement "applies if *any one* of the victims was vulnerable"

within the meaning of U.S.S.G. § 3A1.1(b)(1).  *United States* v. *Crispo*, 306 F.3d 71, 83 (2d Cir.

2002) (emphasis added).  According to the Guidelines a "vulnerable victim" is defined as one

"who is unusually vulnerable due to age, physical or mental condition, or who is otherwise

particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1 cmt. n.2.  The Second

Circuit has articulated three requirements for a victim to be "vulnerable" for purposes of this

enhancement: (1) the vulnerability of the victim must bear some nexus to the criminal conduct;

(2) the defendant generally must have singled out the vulnerable victims from a larger class of

potential victims; and (3) broad generalizations about victims based upon their membership in a

class are disfavored where a very substantial portion of the class is not in fact particularly

vulnerable to the crime in question. *United States* v. *Peirce*, 357 Fed. App'x. 319, 323 (2d Cir.

2009) (citing *United States* v. *McCall*, 174 F.3d 47, 50 (2d Cir.1998).

The Second Circuit has upheld the imposition of the vulnerable victim enhancement

where the victims' vulnerability stemmed entirely from their financial troubles, as those

struggling to make ends meet can, considering the totality of the circumstances, fairly be said to

be "less likely to thwart" a defendant's fraudulent conduct.  *United States* v. *Borst*, 62 F.3d 43,

---

[7]      The average loss suffered by a victim who contacted the Government was $2879. The average loss based on the victims who contacted the Government or for whom bank records were found was $2348.

46 (2d Cir. 1995) (citing *Kaye*, 23 F.3d at 54).  In *Borst*, the court rejected the defendant's argument that the victims of his fraudulent home-financing scheme were not particularly vulnerable, holding that "the very fact that the couples were in such dire financial straits enabled him to commit the crimes for which he was convicted."  *Id.*  A victim's "precarious financial situation alone may serve as the *sole basis* of a § 3A1.1 enhancement.  Such an enhancement is particularly appropriate when . . . the success of the defendant's criminal scheme depended on the victim's financial desperation."  *Id.* at 47 (emphasis added) (citing *United States* v. *Harris*, 38 F.3d 95, 99 (2d Cir. 1994) ("By virtue of their ages and difficulties in providing for themselves, [the victims] were particularly susceptible to alluring promises of financial security.")).

In this case, the defendant intentionally and specifically targeted individuals who were in financial distress.  By offering loan modifications at a time of economic crisis, he focused his scheme on individuals who were likely to be in financial distress.  And to further ensure that he would be approaching financially struggling individuals, AHR purchased leads of individuals who were behind in their mortgages.  (Trial Tr. 807.)  By specifically targeting individuals who were likely to be in financial distress, he targeted individuals who had a greater need for a mortgage modification than the average homeowner and who were, therefore, particularly susceptible to his false promises of assistance.

The enhancement should also apply for a separate, but equally persuasive reason: the defendant's intentional targeting of existing clients for additional payments based on false statements that those subsequent payments would be transferred to the lenders as part of the modifications.  Under Second Circuit law, the vulnerable victim enhancement applies where, as here, individuals who had already been victimized by the scheme were contacted again and defrauded into sending more money.  *See United States* v. *Boyd*, 2 Fed. Appx. 86, 88 (2d Cir.

2001) (citing *United States* v. *O'Neil*, 118 F. 3d 65, 75-76 (2d Cir. 1997) (applying the enhancement were "an important part of the scheme was the re-loading process, whereby individuals who had already been victimized by the scheme were contacted…more times and defrauded into sending more money" to the defendants)).   In this case, there was considerable trial testimony from victims, including Marilou Perez, Jennifer Koontz, and Charles Decker, who were induced through fraud into making multiple payments to Khafizov, particularly after they fell into default or foreclosure as a result of the scheme and called Khafizov in desperation. Khafizov knew these individuals had already been defrauded and were continuing to rely on him, desperately seeking his help, which made them particularly susceptible and vulnerable to his lies.

The defendant contends that there is no evidence that the victims were particularly susceptible to his fraud but were, instead, simply "in need of the services being offered."  (Def. Sub. at 31.)  This argument is not persuasive.  Although "there is skepticism of generalized assumptions about a victim's vulnerability based upon that person's membership in a class…many cases have upheld vulnerable victim enhancements based on group generalizations."  *McCall*, 174 F.3d at 51 (citing *United States v. Patasnik*, 89 F.3d 63, 72 (2d Cir. 1996); *United States v. Echavarria*, 33 F.3d 175, 180-81 (2d Cir. 1994)).  In *Patasnik*, for example, the Second Circuit sanctioned the application of a vulnerable victim enhancement to a defendant who had engaged in an "advance fee loan scam" comparable to defendant's fraud in this case, securing large cash advances from businesses desperate for funds that were unable to arrange financing elsewhere by promising financial relief that never came.  *See* 89 F.3d at 66-67, 72-73.  The court held that "[f]alse financial hope is promoted more easily to persons whose defenses have been lowered by anxiety and the prospect of ruin; indeed, the success of an advance fee loan scheme depends in part upon their desperation."  *Id.* at 72.  Similarly, the

success of the defendant's mortgage modification scheme depended upon its appeal to those who desperately needed help with a mortgage they would otherwise be unable to pay.  Even if the defendant had not from the start chosen his victims from a pool of individuals in financial hardship, he surely "knew or should have known" of at least some of his victims' financial vulnerability when he extracted additional money from those he had already defrauded, as he did with Perez, Koontz, and Decker, fully aware that they were receiving foreclosure notices.  *See United States v. Sinnott*, 523 F. App'x 807, 810 (2d Cir. 2013) ("To the extent [the defendant] was actually unaware of his clients' precarious finances, he should have known once they informed him of their debts.").

For these reasons, the vulnerable victim enhancement should apply.

## II.    Discussion

### A.    The Applicable Law

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3);

the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing

Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among

defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* §

3553(a)(7).  *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to
provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical
care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).   The Government submits that a sentence within the applicable

Guidelines range is sufficient, but not greater than necessary, to achieve the purposes of

sentencing in this case.

**B.      The Nature and Circumstances of The Offense Weigh In Favor of A Within-
Guidelines Sentence**

Khafizov committed a very serious crime.  He callously and repeatedly victimized

innocent, hard-working, financially struggling people who had come to him for help.  He

knowingly preyed on their need.  And rather than actually help these people as he promised to

do, Khafizov coldly manipulated and stole from them.  The more desperate they became, as

foreclosure loomed, the more he preyed upon them, promising them that their miracle cure was

just around the corner, if only they would pay him more money.

Khafizov's crimes would have been serious even if there had been only a handful of

victims who incurred relatively modest losses, but the defendant's crimes are particularly severe

when one considers the number of victims and the extent of the harm he caused each of them.
As the materials in the Appendix and the Victim and Loss Spreadsheet make clear, the defendant
defrauded a huge number of people, and the losses he caused are extremely large – both in the
aggregate and in the context of the financial position of each of his victims.  Khafizov charged
each victim thousands of dollars in  up-front payments, and even after victims had invested
thousands of dollars in modifications that Khafizov knew were not going to be completed,
Khafizov often tricked them into paying additional fees.

Worse still, Khafizov involved his customers in his illegal activity.  As set forth above,
when several customers pressed him to complete the modifications he had promised, he involved
them in fraud by instructing them to include false information and/or documents in their
applications in order to get the modifications done.  Thus, he put his customers at risk by
encouraging them to submit the false applications to lenders.

The harm caused by Khafizov's crimes was not limited to financial distress.  Many
victims have described the strains on their emotional health, marriages and family life as a direct
result of their experiences with Khafizov, as a result of the severe financial distress, and fear that
they would lose their homes, that he inflicted.  The sincerity with which the victims have
described these harms is evident not only in the statements they have made, but also in the
significant number of them who have contacted the Government, and assisted with its
prosecution.

In support of a non-Guidelines sentence, the defendant asserts that fraud defendants
responsible for larger aggregate losses have received lesser sentences than are called for by the
applicable Guidelines range in this case.  (Def. Sent. Sub. at 55-61) It is telling, however, that
many of the cases that the defendant cites were insider trading or financial fraud cases involving

diffuse losses to investors or other cases involving institutional victims.  *Id.*  Although the aggregate losses from Khafizov's fraud were smaller than in some of those cases, the amounts he stole were extremely significant to each of his victims, most of whom were of limited means, and he preyed upon them in a direct, personal way.  Indeed, as shown at trial, the more they came to know and trust him, the more Khafizov stole from them.  (Def. Sent Sub. at 56).  Khafizov's fraud also caused many of its victims to suffer non-monetary losses, including foreclosure, that were extremely harmful and upsetting to the victims.

Given the nature and circumstances of the offenses, a Guidelines sentence is necessary to reflect the seriousness of the crimes, to provide just punishment, and to deter those who, like the defendant, seek to defraud vulnerable victims.

### C.    The History and Characteristics Of The Defendant Indicate A Within-Guidelines Sentence Is Necessary To Deter Him And To Protect The Public

Although not offered at trial, there is considerable evidence that the defendant's fraud at AHR was not his first foray into criminal activity.  Khafizov engaged in fraud at AHR on the heels of participating in a lucrative, years-long mortgage fraud scheme along with the Cassuto brothers.  Although the Cassuto brothers were older than Khafizov and introduced him to their mortgage fraud business, they agreed to join forces with Khafizov in the loan modification business because Khafizov had revealed himself to be so proficient at mortgage fraud.  Khafizov moved on from traditional mortgage fraud to loan modification fraud when the market for mortgages dried up.  It is not an exaggeration to say that essentially all of Khafizov's adult life has involved fraud.

Khafizov's conduct in the loan modification business also demonstrated how difficult it is to deter him from continued criminal conduct.  Even after the Attorney General subpoenaed AHR, even after AHR shut down and even after the Cassuto brothers exited the business,

Khafizov continued – and in fact accelerated – his involvement in the fraud. He essentially transitioned the business to a solo operation in a new office, and continued to solicit new clients and victimize old ones.

Khafizov suggests that the Court should view him as less culpable because he was "led astray by the Cassuto brothers" (Def. Sent. Sub. at 45), but this argument is not persuasive. Contrary to his claims, Khafizov was equally involved in opening AHR, was a full partner from its inception through its closing, and continued and accelerated the fraud after the Cassutos exited the business.  Moreover, Khafizov cannot credibly claim to have been guided into criminal activity by the Cassutos given the apparent ease with which Khafizov continued a loan modification business on his own even after AHR had shut down and the Cassuto brothers ended their involvement.

**III.    Conclusion**

Khafizov is an inveterate fraudster who stole hundreds of thousands of dollars from innocent and vulnerable people who had come to him for help.  He deliberately took advantage of people by preying upon their desperate need to save their homes.  For these reasons, and all the reasons set forth above, the Government respectfully submits that a term of imprisonment within the advisory Guidelines range is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.

**IV.     Request for Sealing**

Because the Victim and Loss Spreadsheet may contain personal identification information of victims, the Government respectfully requests that the Court permit the Government to file these items under seal until it can redact any such information.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/S/_____

Niketh Velamoor
Nicole Friedlander
Assistant United States Attorney
(212) 637-1076/2211

cc:     James Kousouros, Esq.