## JAMES KOUSOUROS
*ATTORNEY AT LAW*

260 Madison Avenue, 22nd floor • New York, NY 10016
212•532•1934 / 212•532•1939 fax
E-mail: James@kousouroslaw.com

March 17, 2014

**BY HAND DELIVERY and ECF**[1]
The Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street, Room 630
New York, NY 10007

      Re: **United States v. Isaak Khafizov**
         **Docket No.: S1 10 Cr. 709 (GBD)**

Dear Judge Daniels:

  Please accept this letter brief in reply to the government's submissions of March 7, 2014 and March 10, 2014 relating to the upcoming sentence in this matter.

*The Advisory Guidelines*

  The Department of Probation calculated the advisory guidelines as follows:

-Base offense level (U.S.S.G.§2B1.1(a)(1))................................................................7
-Loss in excess of $400,000.00 but less than $1,000,000.00 (§2B1.1(b)(1)(H))...+14
-250 or more victims (§2B1.1(b)(2)(C)). ................................................................+6
-Misrepresentation that the defendant was acting on behalf of a governmental
agency (§2B1.1(b)(9)(A))........................................................................... .+2
-Vulnerable victims enhancement (§3A1.1(b)(1))....................................... +2
-Aggravating Role Adjustment (§3B1.1(a)).............................................................+4
-Abuse of a position of trust (§3B1.3).....................................................................+2

Total offense level.................................................................................. 37

In our original sentencing submission we objected to several of these adjustments and the government has agreed that the adjustments pursuant to §2B1.1(b)(9)(A) and §3B1.3

---

[1] We are hand delivering this letter to the Court with the Exhibit referenced herein and are also providing the Exhibit on a thumb drive for the Court's convenience. We are filing this letter via ECF without the Exhibit due to its volume.

1

should not apply in this case. The government thus maintains that the adjusted offense level is 33 with an advisory guideline range of 135-168 months. The government further maintains that a sentence within this advisory range is warranted. We set forth below our response regarding the remaining contested guidelines adjustments and reiterate our request for a non-guidelines sentence in this case.

### *The loss amount and number of victims (Sections 2B1.1(b)(1)(H) and 2B1.1(b)(2)(C))*

With regard to the number of victims in this case, the government maintains that aside from the number of victims who testified at trial, interviews of other victims along with evidence of payments made to AHR summarily supports the conclusion that "every individual who paid money to AHR as reflected in either the bank records or in interviews is properly considered a victim." (See Government Submission, page 16.) Likewise, the government also contends that all fees paid to AHR should be included in the loss amount. We respectfully disagree.

First and foremost, the conclusion that this is a case for which an extrapolation is even necessary is inappropriate. While perhaps interviewing all of the clients of AHR would be burdensome, this is not a case for which the loss amount and number of victims cannot be determined. Even assuming the propriety of an extrapolation, however, the government's leaps from less than ten victims as confirmed through trial testimony, to the 80 victims interviewed, and then to the entire universe of clients who paid AHR is unsupported by the extant record. As we have previously set forth, there is no evidence that all clients of AHR were induced to hire the company through fraud and the government's blanket attribution of such inducement to all AHR clients, many of which received the services they paid for and never complained, is without adequate support.

The government relies on United States v. Uddin, 551 F.3d 175 (2d Cir. 2009), to support the propriety of their extrapolation. This reliance is misplaced. Uddin was a food stamp case in which the defendant pled guilty to exchanging cash for food stamps. The government maintained that all the food stamp redemptions above $50.00, ($1,259,330.39) should be included in the loss amount. During a Fatico hearing, the government produced far more compelling evidence than has been set forth in this case. Two witness testified, *inter alia*, that given the limited supply of eligible food items in the small grocery store, the dusty outdated stock of eligible items [signifying that they were on the shelves for a long time], the small size of the store, the lack of baskets or carts to facilitate purchases of over $50.00, the lack of a delivery service, surveillance which revealed that no customers appeared to be leaving the store with more than $50.00 worth of items yet others emerged counting cash, and the fact that the defendant never redeemed the stamps for eligible items worth more than $50.00 justified the proposed loss amount. Despite this evidence, the Court ultimately calculated the loss amount to be $377,799, a third of that proposed by the government. The Court noted that "a

reasonable assumption is that the store declined in stock from 2002 until the observations in 2006" which led the Court to discount the government's proposed loss by 50%. (Id. at 180.) After cutting the government proposed number in half the court then addressed "the false assumption...that everything of $50 or more was 100% fraudulent" noting that it did not "think there is any basis for that assumption in the record here." (Id.)

To the extent that Uddin stands for the proposition that an extrapolation based upon the record is appropriate only when the actual loss cannot be determined, we certainly agree as we set forth in our original memorandum. Uddin, however supports our position in this case. Here, as in Uddin, the government has proposed the use of *all* funds paid to AHR and *all* clients who engaged the company as appropriately included in both the loss amount and victims. We respectfully submit that the government's proposed extrapolation here, as in Uddin, is excessive and not based upon the record.

As was made clear during this trial and in our initial submission, it simply cannot be said that all AHR clients were defrauded. In order for the government's proposed extrapolation to be accepted, there must be sufficient evidence to justify inclusion of the non-examined portions of the loss extrapolation into the equation. Such inclusion cannot be justified in this case. Inclusion of all clients as victims is improper.

In order for fees paid by a client to be included in a loss calculation, the client must first qualify as a victim – there must have been sufficient evidence adduced at trial that the purported victim actually suffered a loss (United States v. Chang Da Liu, 538 F. 3d 1078 (2008)). The government's assumption that because some clients were induced to hire AHR falsely, every single client was thus induced, is not supported by sufficient evidence. That every single client suffered a loss is likewise unsupported. The defense admitted a six hundred and ninety nine page exhibit at trial which consisted of the ACT reports generated by AHR. ACT was a service paid for by AHR to track the services rendered by the company and to keep a running log of the process for each client. We are annexing the Exhibit herewith for the Court's review and in fact, the government has utilized the reports in its submission although without citing the clients for whom significant work was performed without any complaint.

These records amply demonstrate that several clients were referred by other individuals and received the modifications paid for. More importantly, these records make clear that this Court cannot rely on the government's conclusory assertions that all those interviewed gave credible accounts. For example, the People's first non-testifying victim in their appendix is Kevin Anderson, whose ACT report begins on page 16. (See Exhibit.) The ACT records reveal that Mr. Anderson had already received a modification on one of his loans in November, 2007 and he then applied for another one in November, 2008 with AHR. After constant contact with the client requesting missing documentation, the modification package was sent to the bank in March, 2009. The file was later taken over by International Realty Advisors without complaint.

George Bailey's file was opened in November, 2008. On January 27, 2009, a conference call was held with Mr. Bailey during which he accepted the repayment plan negotiated for $1601.04 while the modification process continued. There is no mention of a complaint or the breach of any promise made. There is yet another significant entry in this log which we ask the Court to note. Much has been made of the advice to clients to stop paying their mortgage. In the December 3, 2008 entry at 5:06pm, it states: "Larry spoke with George Bailey and advised him Indy Mac cannot help him until he is at least 1 month late. File on hold until he is helpable." (See Page 34.) The fact is that many banks would not consider modification applications unless the client was behind on mortgage payments. This is also reflected in the file of Audrey Bass, whose modification would not be approved since it was not 2 months late. (See Page 56.) There are several such entries in the ACT files, the same files relied upon by the government in their submission to this Court. In addition, the ACT files reflect countless clients who were either unresponsive or simply refused to provide documents.[2]

In Ms. Bass' case, for example, the file was worked on for several months during which it was the client who held up the process by not providing properly signed authorizations and paystubs. This client was approved for the "Home Owners Retention Program" as the bank would not lower the rate but agreed to convert the adjustable mortgage to a fixed mortgage. (See Page 56.) Still, the client was not responsive as Tommy Modica noted on November 24, 2008. On December 4, 2008 there is a notation that Countrywide had indicated that the client did qualify for a modification. And yet, in a common about face by the bank, on December 31, 2008 the loan was denied "since the loan was current except for late charges," again a reference to the need to for delinquency (Page 55). Steve and Moreen Alleyne (Page 10) could not be given a modification because they had a fixed rate of 7.6% and were "not late" however they were approved for a "short pay". These clients were repeatedly asked to provide updated financials and did not send them. On February 12, 2009 they received a foreclosure notice but again had not provided the necessary documents to complete the modification package (Page 13).[3]

Robin Hinkle's file was opened in January, 2009 and within days her file was ready for submission. It was later learned that a letter had been sent to her in December, 2008 offering to bring the rate down to the original 8% but that the client had not sent the

---

[2] As the Court is aware, several clients had clearly overextended themselves with loans that they would never be able to pay. It is now common knowledge that this was largely based upon the hope that values would increase in perpetuity and the banks' willingness to lend money without regard to the borrower's credit worthiness or income. Many of the supporting documents for these loans, as in the case of some of the trial witnesses, contained fraudulent information. We suspect that this is at least one reason that several clients would not or could not produce supporting documentation.

[3] This is but one client for whom foreclosure cannot, as the government contends, be blamed on AHR. The fact is that many AHR clients were on the verge of foreclosure and were unresponsive to requests that were designed to prevent it.

4

letter back to the bank and the offer had thus expired (Page 273).[4] This file was clearly worked on diligently only to be thwarted by the client. There is no indication that these clients were induced to hire AHR through fraud or that they complained of having been so induced.

Necessary to support the government's contention is its constant reference to AHR being a fraud from its inception, that only a handful of clients received modifications and that what little work was done by the company was for the sole purpose of keeping it open. A review of the ACT reports reveals this is simply not the case. Indeed, the following individuals were approved for a repayment plan or modification in addition to the trial witnesses, Mary Lou Perez and Jennifer Koontz:

Alleyne: Approved for short pay
Kaomi Abalo: repayment plan (Page 3)
Nuema Appleton: loan approved in December, 2008 (Page 22)
Raymond Baron: (Page 42)
Michael Barrant (Page 45)
Henry Battiste (Page 57)
Diane Belk (Page 62)
Virgina Belt (Pages 66-68)
Gerard Bertrand (Pages 81-82)
Adam Bornstein (Pages 91-93)
Sandra Lee Brown (Page 103)
Edward Campbell and John Astacio (Pages 112-116)
Robert and Tabatha Cedeno (Pages 121-122)
Antonio and Marina Coelho (Pages 140-142)
Moses Collins (Pages 143-145)
Amelia D. Crowner (Pages 146-147)
Carol Detore (Pages 168-170)
Paulette and Donal Esterlin (Pages 183-184)
Valory Ferguson (Pages 198-199)
Scott Cirlin Mark Furlong (Pages 210-211)
Dolores Green (Page 241)
Stella Gronros (Page 247)
Yurly Gubar/Olegna Gubar (Pages 250-251)
Robert Haus (Page 259)
Sundi Calderon an Andrew Hernandez (Pages 270-271)
Chris Honore (Page 276)
Marie Jean Louis (Pages 300-301)

---

[4] We are randomly selecting clients from the appendix. The gap in pages in no way signifies that the clients omitted were not properly serviced.

5

Kenneth Kubiak (Pages 330-331)
Miroslaw Kulik (Pages 332-333)
Brenda Lezame (Pages 357-358)
Joe Martin (Pages 373-374)
Carlos Mejia (Page 401)
Rosa Mendoza (Page 408)
Steven P. Miller and Francis Miller (Pages 417-418)
David and Connie Miramontez (Pages 422-423)
Jorge Montero (Pages 429-431)
Scott Munyon (Page 443)
Viola Ortega (Pages 473-475)
Valerie Perry (Pages 488-489)
Martha Price (Pages 501-502)
Deepak Raval (Pages 513-514)
Prakash Raval (Page 518)
Veerasammy Richard (Page 521-522)
Clyde and Ercelle Ridley (Pages 526-527)
Romula Rubio and Sharon Rubio (Pages 547-548)
Jose Serna (Pages 575-576)
Boris Shulman and Maya Shulman (Pages 578-579)
Mirash Sinishtaj (Pages 591-592)
Tracy Smalls (Pages 596-597)
Peter Stathis (Page 607)
Todd Terry (Pages 631-632)
David Toddish (Pages 639-640)
Dorrick Walter (Pages 662-663)
John Warren (Pages 670-671)
Claude K. Whatley (Pages 676-679)
Elaine Watson (Pages 694-695)

These are all clients who retained the services of AHR and received some form of assistance. The records further demonstrate that for myriad other clients, extensive efforts were made to secure relief for them. The fact that the company operated this diligently – literally hounded the clients for the documentation they refused to provide – is directly at odds with the government assertion that the company was a sham at its inception. Absent any evidence that these clients were actually defrauded, at the inception or otherwise, the inclusion of all AHR clients into the loss and victim calculations cannot be sanctioned.

Based upon the foregoing, we submit that the government's proposed inclusion of all those who paid AHR into the loss and victims calculations should be rejected.

6

In our initial submission we asserted that with respect to the number of victims, a two level adjustment pursuant to §2B1.1(b)(2)(A) was applicable as the government proved that there were more than ten victims or that the offense was committed through mass-marketing. We continue to maintain that this is appropriate. Were the Court to credit the government's contentions regarding the number of individuals interviewed, then as conceded by the government, the number of these victims (84), along with the trial witnesses would support a four level increase pursuant to §2B1.1(b)(2)(B)[more than 50 victims].

Similarly with respect to the loss amount, while the loss amount for the trial victims would result in a six level enhancement, should the Court credit the government's contention as to the amounts collected from the trial witnesses as well as the non-testifying individuals interviewed, a 12 level adjustment would apply pursuant to §2B1.1(b)(1)(G) rather than the 14 level adjustment recommended by the Department of Probation.

*Vulnerable Victims*

While the victims in this case may appear to be vulnerable when considering the every day definition of the term, it is clear from the case law that in order for an enhanced punishment to be justified, something more than general vulnerability is required. Indeed, in United States v. Crispo, 306 F. 3d 71 (2d. Cir. 2002), cited by the government in its sentencing memorandum, the Court made clear that in order for this adjustment to apply, "the victim must have been 'particularly vulnerable' because of his 'substantial inability to avoid the crime.'" (Id. at 83; *citing* United States v. McCall, 174 F. 3d 47 at 51). "Accordingly, the vulnerability inquiry focuses on the victim's ability to protect himself from crime, not the likelihood of harm to the victim if the crime is completed." (Id. at 83.) The Court continued:

> In addition when evaluating whether a victim is particularly vulnerable, it is not sufficient to decide that the individual is more vulnerable than others. Rather, the inquiry should concentrate on whether additional deterrents are necessary to protect the victim (citations omitted). Because the inquiry explores individual attributes, broad generalizations about victims based on their membership in a class are discouraged yet class attributes can be sufficient if they make the finding of vulnerability beyond dispute.

Id. at 83. We submit that the victims in this case were not particularly vulnerable for several reasons. As a threshold matter there was no evidence that the victims were either

7

physically or cognitively unable to exercise the due diligence necessary to thwart the crime. A simple call to their banks would have sufficed to inform them that achieving modifications would be far more difficult and time consuming than promised. Indeed, there was evidence that many clients did make these calls, albeit after they hired AHR. Additionally, the fact is that several trial witnesses were clearly familiar with the process having received prior modifications or entered the process having previously contacted their banks concerning their predicaments. We have not disputed that the trial witnesses were victims in the sense that they were induced to hire AHR based upon misrepresentations. This was the jury's finding. We have maintained, credibly from both a factual and legal standpoint, that they were not vulnerable as contemplated by the facts and *stare decisis* on this issue.

### *The Sentence: Sufficient but Not Greater than Necessary*

We now turn briefly to the government's contention that a sentence within the 135-168 month range is appropriate – sufficient but not greater than necessary – in this case. The government argues that Mr. Khafizov and AHR were singularly responsible for the victim's multi-faceted distress resulting from their financial predicaments. This characterization is unfair. We have stated repeatedly in our sentencing submissions that Mr. Khafizov accepts responsibility for his conduct and the verdict rendered in this case; however, the facts adduced - and the history of the financial crisis which precipitated the offense conduct - make clear that many of the victims of the mortgage crisis sought and received loans which they could not afford and so were the co-architects, along with the banks, of their own financial undoing. On the other hand, we readily understand that others lost their jobs as a result of the crisis and were left without funds to pay mortgages they could otherwise afford. However for the government to place the blame for all of the AHR clients' suffering on Mr. Khafizov, when the circumstances surrounding many of the individual's financials are unknown, is untenable.

We have recognized that punishment is in order. We have only sought just punishment and punishment which is commensurate with Mr. Khafizov's conduct, his personal history and circumstances and other frauds for which punishment has ensued. In this regard we have submitted for the Court's consideration several cases for comparative purposes. In response thereto, the government - in seeking *an eleven to fourteen year sentence* for a 28 year old defendant who committed his one and only criminal offense at the age of 22 - gives short shrift to the victims of dozens of other frauds stating that "[i]t is telling, however, that many of the cases that the defendant cites were insider trading or financial fraud cases involving diffuse losses to investors or other cases involving institutional victims". Did the government make this statement at the sentencing of Rajat Gupta last year or any of the other defendants we cited? Of course not. In all of the cases we cited, the government asked for decades *because* of the effect upon the victims.

The victims in the cases we cited were all victims as worthy as any other. The Enron collapse affected investors who lost their life savings and employees whose entire retirement accounts were decimated. This was a multi-billion dollar offense for which the ultimate sentence was 14 years. The insider trading cases we cited resulted in untold financial calamity to smaller investors as the market was manipulated to their detriment. I have yet to witness a sentencing in such a case during which the government in this district or any other district does not cite the effect upon the system and the "little" guy. The Mazella case, in which Judge Amon sentenced the defendant to ten years, involved a 14 million dollar fraud perpetrated, not upon institutional investors or those that we suppose the government believes are distinguishable from the victims in this case, but upon the defendant's elderly family members who were found by the court to be vulnerable victims. In most of the cases we cited, the courts looked at other frauds of all shapes and sizes in order to devise what they considered to be fair sentences. To not consider these cases would result in an unduly harsh disparity between this case and other much more egregious frauds.

There is one other case we failed to mention in our initial submission. Just a few weeks ago, JPMorgan Chase, having been found criminally responsible for conduct which, in part, facilitated the more than one hundred billion dollar Madoff fraud, was permitted to pay $1.8 billion dollars, about 6 weeks of its 2013 *net income* and two weeks of its 2013 *gross income*, and was granted a deferred prosecution.[5] This was despite the fact that criminal conduct was attributable to the company as a whole as well as to individual executives who looked away from clear evidence of the fraud which generated significant income to the bank. Surely this conduct affected hundreds of innocent victims who lost, in some cases, their entire life savings as a result of this monumental fraud.

In the final analysis, even by the government's estimation, this was a $400,000 fraud perpetrated by a young man with no prior criminal history, a strong family backbone and a youth spent helping his family while building a life with his wife. This is not, we respectfully submit, a case for which a decade in prison is appropriate. Surely a sentence far less than that proposed by the government, in light of all the circumstances set forth herein, would be sufficient – but not greater than necessary – to achieve the goals of punishment. We respectfully renew our request that the Court impose a non-guidelines sentence in this case.

---

[5] JP Morgan reported Full-Year 2013 Net Income of $17.9 Billion, or $4.35 Per Share, on Revenue of $99.8 Billion. The company was also permitted to pay $1.3 billion for its role in the financial meltdown which precipitated the mortgage modification programs at issue in this case. While the possibility of criminal liability remains, no charges have been brought to date.

9

Thank you for your courtesy and consideration.

Very Truly Yours,

James Kousouros

Cc:   Niketh Velamoor
      Nicole Friedlander

      Isaak Khafizov