E3JPKHAS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

       v.                              10 CR 709(GBD)

ISAAK KHAFIZOV,

               Defendant.

------------------------------------x

                                  New York, N.Y.
                                  March 19, 2014
                                  2:07 p.m.


Before:

                   HON. GEORGE B. DANIELS

                              District Judge


                       APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  NIKETH V. VELAMOOR
     NICOLE W. FRIEDLANDER
     Assistant United States Attorneys

JAMES KOUSOUROS
TONY MIRVIS
JEREMY SCHOLEM
DEBRA KOUSOUROS
     Attorneys for Defendant

E3JPKHAS

1          (Case called)

2          MR. VELAMOOR:  Good afternoon, your Honor.  Nick

3    Velamoor and Nicole Friedlander for the government.

4          THE COURT:  Good afternoon.

5          MS. FRIEDLANDER:  Good afternoon.

6          MR. KOUSOUROS:  Good afternoon, sir.  James Kousouris.

7    I represent Mr. Khafizov.

8          THE COURT:  Good afternoon, Mr. Kousouros.

9          MR. MIRVIS:  Good afternoon, your Honor.  Tony Mirvis

10   also on behalf of Mr. Khafizov.

11         THE COURT:  Good afternoon.

12         MR. KOUSOUROS:  Judge, we're also joined by part of my

13   office, Ms. Kousouris is here and Jeremy Scholem is here.

14         MS. KOUSOUROS:  Good afternoon, your Honor.

15         MR. SCHOLEM:  Good afternoon, your Honor.

16         THE COURT:  Mr. Kousouris, let me start with you.

17   Have you received a copy of the presentence report and had and

18   opportunity to review it with your client?

19         MR. KOUSOUROS:  Yes.

20         THE COURT:  Before I address the guideline range as

21   calculated, do you have any other corrections or objections

22   that you are making to the report itself?

23         MR. KOUSOUROS:  No, your Honor, just those which we've

24   detailed in our submissions.

25         THE COURT:  Then let me first start with, the last

E3JPKHAS

1    letter I received indicated, although I don't think I got an

2    acknowledgment by the government on that, the defense letter,

3    indicating that the government is not seeking certain

4    enhancements to the guideline.  Let me first see if we can

5    resolve those and see how that affects the guideline range.

6          I think I was told that the government was no longer

7    seeking two points for misrepresentation that the defendant was

8    acting on behalf of a government agency, the 2B1.1(b)(9)(A); is

9    that correct?

10          MR. VELAMOOR:  Yes, your Honor.  We addressed that,

11    and I hope the Court received our sentencing memorandum.

12          THE COURT:  Let's make sure I did.  I have the

13    government's sentencing memorandum.  Let me make sure the

14    sequence of events.  The sentencing memorandum, no, I don't

15    think I do have it.  When did you submit it?

16          MR. VELAMOOR:  We dropped that off to chambers, I

17    believe, a week ago.  Last Monday we dropped it off, along with

18    two volumes and an appendix.

19          THE COURT:  Oh, yes.  Yes, I do have that, but I don't

20    remember that those issues were addressed in there.

21          MR. VELAMOOR:  They were not addressed in any detail;

22    so perhaps that's why, but we did indicate -- so to answer your

23    Honor's question, yes, we are not contesting the objection to

24    that enhancement.

25          THE COURT:  Because the most recent thing I received

E3JPKHAS

1   was the March 17th letter from Mr. Kousouris that indicated

2   that you were not seeking that enhancement, and so I haven't

3   heard from the government since then.

4           MR. VELAMOOR:  We previewed in our submission that we

5   would not be contesting that, and we continue to not be

6   contesting it.

7           THE COURT:  So that would have been a two-point

8   enhancement, which would no longer apply.

9           Now, what about, it was also represented that the

10   government was not seeking abuse of a position of trust.

11           MR. VELAMOOR:  That's also correct.  As we wrote, we

12   are also not contesting that enhancement.

13           THE COURT:  All right.  So let me address the two

14   primary -- in my view, the two primary issues that I think

15   might warrant some adjustment, and then we can address the

16   others.  The government was seeking a loss amount in excess of

17   $400,000 and less than $1 million, and 250 or more victims.

18   And, basically, the argument to that was the amount of revenue

19   generated or received by Mr. Khafizov and his entity and the

20   number of clients.

21           What I remember, and from the government's submission,

22   is that -- and what I find much more compelling, unless the

23   government, and I'll let the government be heard further, is

24   that the government represented that the government

25   specifically had identified more than 80 victims, who variously

5

E3JPKHAS

1   testified, had been interviewed by the government, or had

2   submitted personal statements regarding the impact of the

3   defendant's fraud on their lives.

4         And the government also represented that the

5   government has identified actual losses suffered by the more

6   than 80 trial witnesses and other victims who have made

7   statements in this case, of approximately $230,000.  Those are

8   the actual numbers that were attributed to victims and loss

9   attributed to those victims.

10         It seems to me that that would be the appropriate

11   number to use, and I'll hear the government further, if they

12   wish to press this further.  But from my calculation, that

13   would be a 12-point enhancement for $200,000 or more, but less

14   than 400,000; and a 80-victim enhancement, I think it is an

15   80-victim enhancement, of four points instead of six points.

16         I mean, I think that that doesn't seem, at least to

17   that extent, doesn't seem to be significantly in dispute on

18   this record, but I'll hear from the government as to whether or

19   not you believe that you could sustain a record that would

20   warrant a higher enhancement, or whether it's worth doing that,

21   and hear from Mr. Kousouros as to why he says, if he has any

22   arguments based on those representations, that those numbers

23   should be any less.  Yes?

24         MR. VELAMOOR:  We absolutely believe that the victim

25   number should be 250 or more and that the loss should be more

E3JPKHAS

1   than 400,000, and so I'll explain why.  You know, first of all,

2   we have -- I want to take issue a little bit with how the Court

3   described the evidence with more than 80 and more than 400,000.

4   We're not simply relying on the revenues to the business, nor

5   are we simply relying on people who were clients of the

6   business.

7        We have identified more than 250 people who actually

8   paid money to the defendant or his business, and we've

9   identified the specific amounts of money they paid, and so

10  these are people who paid different amounts of money.  We've

11  listed, you know, in our spreadsheet the exact amounts that

12  each one of those people paid.  And we totaled that up, and you

13  get a number well in excess of 700,000; so this is not -- we're

14  not just simply estimating or guessing or speculating based on

15  the revenue of the business.  These are actual payments by

16  victims.

17       THE COURT:  Well, what I didn't have that went along

18  with that is whether or not any of these people did or did not

19  receive any services that led to or didn't lead to any

20  modification of their mortgage.

21       MR. VELAMOOR:  Well, so let me address that in

22  specific ways.  First of all, we have -- firstly, I don't

23  believe that's actually, frankly, relevant.  Whether these

24  people got a modification or not is not relevant.  This was, as

25  the Court pointed out at trial, as the Court instructed the

E3JPKHAS

1    jury at trial, this was a fraud in the inducement.

2         The fraud was lying to these people to get them to pay

3    their money to AHR.  Whatever happened after that, however much

4    work was done after that, whether they got modifications after

5    that is irrelevant.  That's what the law says.  We cited cases

6    in our submission that support the fact that when you take

7    someone's money by lying to them, you can't make it better

8    after the fact by providing services to them.  So on the first

9    fact, you know, whether or not they got modifications, I think,

10   is just a distraction.  It's irrelevant.  It doesn't really

11   matter.

12        Now, beyond that, on the facts, there's, frankly, no

13   reason to believe that many of these -- any real number of

14   these people got any modification.  There was testimony about

15   that at trial, that virtually none of the people got any

16   modifications.  They certainly didn't get them within the time

17   frames that they would get them.  So there's virtually no

18   evidence that any substantial number of people got

19   modifications from the defendant.

20        On the contrary, there is evidence, substantial

21   evidence from the trial, that those people who decided to part

22   with their money and give it to AHR, did so based on fraudulent

23   statements.  They were induced through fraud.  There's a lot of

24   evidence in the record about that.  First of all, there was,

25   for example, the fact that customers were brought in through a

E3JPKHAS

mass mailer.  That mass mailer contained false statements.
This is not a one-off strategy that particular loan officers
were using.  This was a mailer that everyone was.  It was sent
out to many, many people, and many people responded to that.

There was also evidence at trial that scripts were
given to the callers at AHR, and those scripts contained
numerous false statements, false statements about the
modification being guaranteed, false statements about the
modification coming in between 30 and 60 days or maybe 90 days,
false statements about whether refunds were guaranteed.

There's testimony, there's evidence that Mr. Khafizov
approved these scripts, made the statements himself.  Again,
this is not one off-things that particular people were saying.
This was the practice of the company that was set forth in
scripts that people were supposed to follow, and it all
contained lies.

So beyond that, you know, frankly, there's very little
reason to believe -- well, let me add to that that there's
direct testimony from witnesses at trial that American Home
Recovery was not even the first loan modification business.  It
was the next-generation loan modification business after
Benjamin Modification Agency.  Benjamin Modification Agency,
the defendant was a principal of that company.  That company
was also a fraud.  It was a failure.

We didn't consider any of those people as victims, but

E3JPKHAS

the crucial part is when they opened up AHR, they knew that

everyone they continued to tell the same false statements they

had been telling to Benjamin Modification's clients, could not

be true, but they continued to tell them anyway, and those were

lies.  So we have every reason to believe that the only way

they got business was by lying to people.

          We spoke to 80 people.  We provided the Court

memorandums from all the interviews.  We didn't hold any of

them back.  You can tell from reading them that they were all

lied to in order to get them to part with their money, and so I

don't think it's difficult, or I don't think it's much of a

leap for the Court to estimate, which is all you need to do is

estimate, when you have a universe of hundreds and hundreds of

additional clients that we've identified, when you have bank

records confirming their payments that, you know, a little over

170 of these three, 400 additional people were lied to in order

to get them to pay their money.

          THE COURT:  I wasn't quite sure.

          MR. VELAMOOR:  Let me -- Sorry.

          THE COURT:  I wasn't quite sure.  There were a number

of individuals identified as victims where there's no loss

amount.  How do you explain that, and what do you want me to

conclude from that?

          MR. VELAMOOR:  Well, let me just say, first of all,

that you don't need to consider any one of those people as a

E3JPKHAS

victim in order to have at least approximately 300 victims
because, as we set forth in our papers, we've identified 300
people who were either interviewed or for whom we have
identified bank records showing that they specifically
personally paid money to AHR.

So the people who we have not attributed a loss
amount, those people are people who we identified through the
ACT database, which was the defendant's company's database of
customers.  Those provided an additional universe of more than,
you know, 200 more, or at least 200, possibly more, possible
victims.  And the Court, frankly, does not need to find any
single one of them to be a victim in order to meet the
threshold the government is seeking.

I think it's, frankly, hard to believe that at least
some of them and, frankly, probably most of them, were also
victims.  It's impossible to believe that the defendant's
company would have provided services to anyone without taking
money upfront.  That was a practice of the business.  So in
order to provide an additional cushion for the Court in making
an estimate, which is all it needs to do, is make an estimate,
those additional 200 victims provide even more cushion to take
us even farther above the 250-victim threshold that we're
already at.

In terms of the losses, on the loss side of things,
again, we're not relying on a single dollar from those people

E3JPKHAS

1    to get way past 400,000.  We're at 750-some-thousand just based

2    on victim interviews and bank records.  We've attributed zero

3    amounts to all these people who were just identified through

4    ACTS.  Again, I find it impossible to believe that these people

5    didn't pay money because AHR was not in the business of

6    providing services for free.

7           But, again, the Court doesn't need to count on a

8    single dollar from any of those additional hundreds of victims

9    in order to find at least 400,000 victims in this case.

10          Also, on the whole issue, and the last point I'll make

11   about, getting modifications, again, I want to stress I don't

12   think that's relevant.  I think the law is very clear.  If

13   you're induced to part with your money through fraud, you're a

14   victim, and these people were induced to part with their money

15   through fraud.  But another important fact we learned at the

16   trial is where the defendant managed to get any success in

17   getting progress from banks, he generally, in many cases, did

18   that through additional fraud, through fraud on lenders,

19   through by creating false assets or false income.

20          So, you know, even if the Court were to believe that

21   that customer was not a victim, and I think it's very important

22   that they were, he made the bank a victim in those particular

23   cases, you know, whether the customer is a victim or not and,

24   again, the customer certainly is.  And, frankly, this is an

25   allegation that I'm just not making here.  This is a finding

E3JPKHAS

1   that the jury made when they convicted the defendant, not only

2   defrauding customers but also defrauding lenders.  So this is

3   something that the government's proven not just beyond a

4   preponderance of evidence but also beyond a reasonable doubt.

5          THE COURT:  What is the dollar amount that you

6   actually have computed?

7          MR. VELAMOOR:  This is what we've done, essentially, I

8   want to make sure I'm explaining what we've done.  We

9   interviewed, our office interviewed more than 80 people.

10  We've, you know, figured out -- found out from them what their

11  losses were.  In many cases we corroborated what they told us

12  through bank records.  Where there was any small discrepancy,

13  we always took the lower number.  From those 80 people, we

14  found more than $230,000 in losses.

15         Then we went through the bank records for American

16  Home Recovery and for the defendant's company, IF Management

17  and Consulting.  What we did not do is simply take a total of

18  all the money that went into those accounts.  We did not do

19  that.  We went through each check.  We looked at only checks

20  that came from individuals.  In many cases, or most, if not

21  all, cases individuals who were also found in the ACT database;

22  so that proved that they were clients of the company, and we

23  added the specific dollar amount that those particular people

24  paid to the defendant.

25         So we're not just taking the revenues of the company.

E3JPKHAS

We're getting payments from people who we believe, and who the evidence shows are customers, and we're totaling those payments as well.  And when you total those payments, in addition to the 230,000, you have -- the total of those goes all the way over 700,000.  You get approximately $715,000; so that's, you know, almost $400,000 more loss specifically attributable to particular victims.

Again, we've broken it out in our chart per victim, and so we now have actual losses, not a projection, not an estimate, actual losses of well over $700,000.  From this evidence, we think that the only reasonable estimation of loss, based on the evidence, is a loss well in excess of $400,000.

THE COURT:  Well, what is the number of victims that corresponds to the dollar amount that you have set?

MR. VELAMOOR:  The number of victims who correspond to the dollar amount, okay, so the $715,000 in losses corresponds to approximately 300 victims.  Approximately 80 -- more than 80 who were interviewed, plus an additionally approximately almost 200, around 200 more, gets you to about 300 people who we have identified bank records.  So the 705,000 corresponds to only about 300 victims, which frankly, is consistent also with the evidence that we had at trial, where the standard payment was around two-or-so-thousand dollars, but the defendant managed to hit certain victims up for even more and that accounts for the additional.

E3JPKHAS

1          THE COURT:  So you're going with the approximately 300

2     victim number?

3          MR. VELAMOOR:  We think that, you know, at least

4     approximately 300, and then we have an additional, as I pointed

5     out, universe of almost 200 people who, again, we haven't found

6     a specific payment, but we've identified them in the ACT

7     database.  If the Court wants a little bit more cushion, all it

8     needs to conclude is some small fraction of those people were

9     also victims, and then you're well above 300.

10          But, yes, I think the most conservative estimate of

11     victims is around the 300 people who made payments,

12     corroborated by bank records and people who have been

13     interviewed or provided statements to the Court.

14          THE COURT:  And you say the amount of money in

15     payments, what did you use to accumulate the payment amount?

16          MR. VELAMOOR:  What we did for the payment amounts

17     was, in the case of interviews, what people told us, and in

18     many cases, if not most cases, corroborated by bank records or

19     records that the witnesses gave us, plus again, going through

20     the bank records.

21          THE COURT:  Which bank records?

22          MR. VELAMOOR:  Bank records for AHR, American Home

23     Recovery and bank records for the defendant's company, IF

24     Management and Consulting.  And going through the checks, you

25     know, one by one saying here's a check from Hector Ironez for

E3JPKHAS

1   $1,995.  We have a bank record that confirms that Mr. Ironez

2   paid AHR or IF Management $1,995.  So we add it to the list.

3          THE COURT:  And is there any way that you identified

4   that that was, in fact, a payment from a customer?

5          MR. VELAMOOR:  Well, first of all -- Well, the fact

6   that that person was a customer?

7          THE COURT:  Yes.

8          MR. VELAMOOR:  Most, if not all, of these cases we

9   double checked it with the ACT database to show that that there

10  was also a record for this person in the ACT database.  Some

11  cases we weren't able to do that, in part, because of the

12  evidence established at trial.  The defendant freelanced, in

13  many ways, and continued on his own under the IF Management

14  name; so they didn't always appear in the ACT database.

15          But there's also, frankly, no other explanation

16  because these are not businesses that are paying money to AHR.

17  There's no other reason why anyone would be paying amounts that

18  are entirely consistent with the fees that AHR was charging.

19  There's, frankly, no other reason why these people would be

20  paying money to AHR, other than for services rendered.  This

21  was a simple business.  The business was to supposedly provide

22  loan modifications for individuals.  The money coming in from

23  individuals, I think, can very fairly be inferred to be

24  payments from customers and customers who were, frankly,

25  victims.

E3JPKHAS

1           THE COURT:  And you went from what period of time?

2           MR. VELAMOOR:  For the bank records?

3           THE COURT:  Yes.

4           MR. VELAMOOR:  The bank records, for essentially the

5    life of the business; so, you know, 2008, perhaps into 2009.

6           THE COURT:  When you say the life of the business,

7    what --

8           MR. VELAMOOR:  American Home Recovery and IF

9    Management Consulting for the time period that the defendant

10   was using that bank account.  Again, the defendant was charged

11   with conspiracy.  The time periods we relied on are within the

12   scope of the conspiracy in the charges.

13          THE COURT:  Mr. Kousouros?

14          MR. KOUSOUROS:  If it please the Court, good

15   afternoon, Judge.  Judge, I think that your original

16   inclination was correct.  In our memorandum, we -- in our

17   initial memorandum, we had argued that the government should be

18   held to the victims that testified at trial; however, I

19   understand, and I put in my subsequent submission that, given

20   the preponderance standard, let's look and see where there is

21   any actual proof.

22          Because the government's an conclusions and the work

23   that they did, as numerically correct or accurate as they may

24   be, still require the initial supposition that the crime was

25   committed with respect to all of these people.  And that is, if

E3JPKHAS

1    you were to just say only the inducement and nothing else and

2    forget about the services that were rendered and the

3    modifications which were had, and I think that that was your

4    question initially.

5            If you take the people interviewed, and we've got

6    those interviews, some of them are not bad interviews, but if

7    you take all of the interviews, if you take 80-plus people and

8    the testimony of the victims at trial, and then you take the

9    commensurate amount that was paid by those people, at least you

10   have some evidence upon which you can rely.  But quite frankly,

11   I think you first need to get past the issue of whether or not

12   the extrapolation process is even called for in this case.

13           I mean, an extrapolation, obviously, under Shonubi and

14   all of the cases that we've looked at, basically, it's a way

15   that this Court does not allow a defendant, for example, to get

16   away with something because it's such a huge and impossible

17   universe to look at, that you cannot discern what the actual

18   damage is.  That's not what this case is.  And I'm not saying

19   that it wouldn't be burdensome, but there are so many factual

20   issues here, so many other possibilities, that this is not a

21   case for which an extrapolation should be applied.

22           This is a case for which the Court should look at the

23   trial testimony, should look at those victims, which we've

24   acknowledged and accepted, and then look at the other

25   interviews, and you make your determination whether they

E3JPKHAS

satisfy the preponderance standard.  There is no evidence,
there is no evidence, other than the government's supposition
here, that every single person that hired AHR did so having
been fraudulently induced.  There isn't.  You can say that
because it happened in these cases, it automatically happened
in those cases.  It's not how we enhance punishment.

Now, granted, punishment can be enhanced under the
guidelines, the advisory guidelines from a preponderance
standpoint, but this is inappropriate in this case.  Your
question is clearly a good question about the people who
received modifications.  And I will say that I find it rather
interesting that the ACT records are good enough for the
government to rely in arguing to you that you should enhance
the sentence, but perhaps they're not good for other reasons.

We've given them to you.  The fact remains is that in
my latest submission, you've got close to 60 to 65 people which
don't count IRA, which is the agency that Khafizov hired to
finish these files, well over 60 people that received
modifications or received repayment plans.  There's no reason
to not believe that.

The other thing that you have to look at, because the
government keeps talking about witnesses.  The witness upon
whom they relied in large part is David Cassuto.  Now, the
other thing the ACT records also show, Judge, is that --
putting aside just for a minute the inducement, and I know that

1    that's hard for you to put aside, and I know that, I recognize

2    that.  You look at these reports, and you have got a company

3    that was hounding people for documents.  You've got a company

4    that is calling banks, being put off by banks, being told that

5    banks lost the file, still staying with it, hounding people.

6         The government talks about, and puts at this fellow's

7    shoulders -- there's pain to be put at this fellow's shoulders,

8    don't get me wrong, but everybody's financial distress and pain

9    in this case is his fault.  There are people who are being

10   hounded for documents, who then receive foreclosure notices,

11   then called AHR and said what's going on?  And AHR looks at

12   them and says, of course you got a foreclosure notice.  We've

13   been asking you for these documents for months.

14        So much has been made of the fact that Mr. Khafizov --

15   and it was in the government's initial sentencing memorandum --

16   you're not getting a modification unless your loan is late.

17   We've given you example after example about clients who would

18   call and banks who would say, we can't help them unless they're

19   behind.  This entire industry was a mess.

20        And you know, Judge, from your time, that you had

21   victims, what are they going to say?  I love AHR?  That's why

22   we have trials.  That's why witnesses testify.  I get it that

23   it's a preponderance standard for the people who were

24   interviewed.  I've got no reason to think that the agents in

25   this case lied in their reports, but at least you have some

E3JPKHAS

evidence that you can rely on and say, if you so decide that by

a preponderance of the evidence, I'm going to find you had 80

to 90 victims, by a preponderance of evidence, I'm going to

find that the money that those victims paid qualifies.

          But the government says people didn't get refunds.  A

lot of people got refunds.  We have some names here.  The

government says nobody got modifications.  Upon what do they

rely?  On David Cassuto?  You know, I tried to walk a fine line

in my submission in this case, and I hope I didn't cross it

with you because I am not, in any way -- and this is a

defendant, who got convicted after trial, and you don't have

this very often.  He is not minimizing his culpability.  He is

not telling you he's not sorry.

          But the notion that we're going to believe a man who

takes the stand and says that this company, from the minute

they walk through the doors of this Manhattan office, that

they're paying all of this rent for, was nothing but a sham, in

the face of these records that show all of the time and effort

put in?  What I said in my initial memo, Judge, was that it was

an industry, and it's this industry, it's the mortgage

industry, it's the stock industry, and it's all bad, and we get

it, where you overpromise but then you try to deliver because

you want to succeed in your business.  And that's really what

happened here.

          But the notion that they're simply going to say that

E3JPKHAS

1   because these people say that they were lied to about certain

2   things, the entire universe of clients -- I heard the word

3   "approximately" and "maybe" how many times?  It's not how we

4   take sentences and enhance them by point after point after

5   point.  So if the Court is inclined to accept the fact of an

6   extrapolation being appropriate here, I think that where you

7   were kind of dividing it is appropriate.

8           And in terms of a preponderance standpoint, you've got

9   three leaps here.  The government says, take the trial

10  witnesses, then take the witnesses that were interviewed, then

11  let's just put the whole ball of wax in and say it happened

12  with everybody.  That's what happened in Uddin, which was cited

13  by the government in their submission, and the Court in Uddin

14  said you can't do that.  Let's look at what you have some

15  evidence of.  And quite frankly, as I put in my submission, I

16  think the showing in Uddin at a Fatico hearing with witnesses

17  testifying, was far more compelling than simply saying we took

18  bank records, we know this many people paid, we know this is

19  how much they paid, and now we're telling you, Judge, assume

20  that not a minority but a vast majority, or not a vast

21  majority, but a good amount of the people that puts us over the

22  edge of these guidelines, you should simply speculate had the

23  same thing happen to them that everybody else.

24          So with all due respect, I think that if you're

25  looking at it from a preponderance standpoint, I think that the

E3JPKHAS

1   Court's comments were on, and if you were to find that the

2   interviews that were conducted suffice, then what I would

3   respectfully submit is it is 50 -- it's over 50, not 80.  It's

4   over 50 in order for a four-level enhancement, and that it's a

5   12-level enhancement on the money that the people that

6   testified at trial, as well as the people interviewed, were

7   counted.

8             THE COURT:  Yes.

9             MR. VELAMOOR:  Briefly.  First of all, with

10  Mr. Cassuto, Mr. Kousouros didn't believe him, the jury

11  believed him because they convicted the defendant of

12  conspiracy.  As Mr. Kousouros pointed out at length, the only

13  witness for a conspiracy was Mr. Cassuto, the defendant was

14  convicted of participating in the conspiracy.  So in any event,

15  Mr. Cassuto's testimony should be believed, but more

16  importantly, we're not asking the Court to extrapolate.

17            Extrapolate would be the government presents you with,

18  you know, $50,000 of losses with respect to ten people, and

19  then ask you to estimate going forward how much it would be for

20  a bunch of other people.  We're not asking the Court to do that

21  in this case.  We've identified specific losses for specific

22  people.  And, again, there is specific evidence, not the

23  government's supposition but specific evidence, that these

24  people were induced through fraud, testimony at trial, that the

25  government didn't make up, about the fact that this was a

E3JPKHAS

1   follow up to a fraudulent business, that they knew it in

2   advance that they weren't going to give refunds.  That was

3   testimony at trial.  This is not just something I'm just saying

4   from this table.

5       There was mailers that went out on a mass basis that

6   went to as many disadvantaged homeowners as possible.  This is

7   not something the government made up.  This was a document that

8   was produced and provided in evidence.  Scripts containing

9   false statements, testimony that those scripts were to be

10  followed by people calling customers.  Again, this is not

11  something that the government is making up.  This is evidence

12  that was offered at trial, and this evidence shows that when

13  these people became customers of AHR, they became customers of

14  AHR through fraud.

15      We're not asking the Court, even despite all that

16  evidence, which I think is far beyond preponderance, the Court

17  doesn't even need to find that every customer of AHR was

18  induced through fraud to be a victim.  The Court only needs to

19  find a fraction of the people, additional individuals who have

20  been identified, beyond those who were in it in order to find

21  the 250-victim threshold.

22      And in terms of losses, the Court has specific losses

23  attributable to specific people, backed up by bank records, but

24  again, the government did not make up, confirming that these

25  people paid well more than 700,000, let alone more than

E3JPKHAS

1    400,000.  So we think that there's, you know, more than

2    sufficient evidence to meet the government's burden of

3    establishing 250 victims and 400,000 in losses.

4           THE COURT:  Mr. Kousouros, did you want to be heard

5    further with regard to the other adjustments enhancement?

6           MR. KOUSOUROS:  The vulnerable victims?

7           THE COURT:  Yes.

8           MR. KOUSOUROS:  Judge, we will rely on our

9    submissions.  The only thing I would point out is that, in

10   reviewing the materials that we had previously submitted, you

11   know, it's almost counter-intuitive because of the dictionary

12   definition of the term, and that's kind of troubling because

13   you look at people who are having trouble paying their

14   mortgage, and so I suppose you automatically say, well, they're

15   vulnerable.

16          And our only point is that we certainly acknowledge

17   that they are victims of this offense.  It is our belief that,

18   based on Second Circuit case law, when you look at the Box case

19   and the bail bondsmen, you look at the Sutherland case with the

20   memorabilia, and these were elderly people, you look at the

21   Stoffer case, when you're targeting parents who want to adopt

22   children, and they're not found to be vulnerable.  I think it

23   simply gives more voice and meaning to the particularly

24   vulnerable, susceptible language in the guidelines.

25          So while we certainly understand that they're victims

E3JPKHAS

1    that we believe that the enhancement is designed for those for

2    whom a far more particular and established vulnerability would

3    attach.

4            THE COURT:  Did you want to be heard any further with

5    regard to the enhancement for being an organizer and leader of

6    criminal activity?

7            MR. KOUSOUROS:  Judge, we've looked at the guideline,

8    and we do not believe that there's a viable argument on that

9    adjustment.

10           THE COURT:  Mr. Velamoor, do you want to be heard on

11   those two?

12           MR. VELAMOOR:  Just briefly, on the vulnerable victims

13   point.  Again, I find it somewhat remarkable that the defendant

14   can cite Second Circuit law when the defendant has not

15   addressed the Second Circuit law that we cited in our papers,

16   which make it clear that financial vulnerability qualifies,

17   under the vulnerable victim enhancement, the Borst case and the

18   Harris case.

19           I believe Borris applied that enhancement in the

20   context of customers of a similar mortgage business and found

21   that people who are in financial trouble are vulnerable to

22   schemes like this.  So I think the Second Circuit case law, I

23   think, is clear that the vulnerable victim enhancement applies

24   to people in financial distress who were victimized in a scheme

25   like this.

E3JPKHAS

1          The Court was present at the trial.  Some time has

2    passed, but the Court was present at the trial, and saw these

3    people and they were clearly vulnerable victims.

4          The second point about vulnerable victims, another

5    argument that the defendant is not addressing is this whole

6    point about reloading.  The Second Circuit law is also clear

7    that even if the person is not a vulnerable victim the first

8    time, when the defendant hits them up again for multiple

9    payments, that itself, by itself, qualifies for this

10   enhancement.

11         And that was some of the most powerful and, in many

12   ways, troubling evidence at this trial, where the defendant

13   would in his business, would take money from these people

14   initially, sit on their applications.  And then when they got

15   desperate and called him, knowing that they were desperate,

16   hearing the desperation from them, he would then craft a new

17   lie saying, you know, if you give me some more money, it will

18   go to the mortgage lender, it won't go to me.  And they gave

19   him the money, and he used it for his car and his other

20   personal expenses.

21         But that whole aspect about reloading is an entirely

22   separate basis for the vulnerable victim enhancement that

23   equally applies here, and it applies very powerfully on the

24   facts of this case.

25         THE COURT:  With regard to the guideline range, I do

E3JPKHAS

believe adjustment in the guideline range is appropriate.  I'll
start backwards.  With regard to the adjustment for the role
adjustment, I think the role adjustment is appropriate and was
clearly supported here.  I think, regardless of how one wants
to assess, you know, how the scheme began, who was involved in
it at the beginning, it's clear that for a substantial portion
of this criminal activity, that Mr. Khafizov acted as the main
person who was running these companies and this activity and
directed the activity of a number of people.  I think the role
adjustment is appropriate.

I think that the volume of work that they were doing
clearly required supervision, and the number of people which
the evidence indicated and required a particular enhanced role
for Mr. Khafizov to be the organizer and leader in order to
make sure that the scheme pretended to be profitable and avoid
the scrutiny of law enforcement.  So I think that that
enhancement, particularly given the significant role and very
little evidence, no evidence throughout most of this period
that there was anyone else who was a person who was in charge.

I think the defendant has already acknowledged that,
at some point, the others fell out of this activity, and he was
basically left to run what was a sophisticated criminal scheme,
which required assistance of others to process and collect fees
and to engage in the activity to keep this criminal activity
profitable and ongoing.  So I think that that's an appropriate

E3JPKHAS

1    enhancement.

2              With regard to the vulnerable victims enhancement, I

3    think that is also clearly appropriate.  In this case, not only

4    what I would describe the victims, particularly the victims

5    that testified at trial, not only will I describe as

6    financially vulnerable, I would have to describe many of them,

7    if not most of them, as desperate.  They were, obviously,

8    individuals who were had no other recourse because of their

9    financial situation, other situations where they just had no

10   ability to save their homes.

11             They reached out to Mr. Khafizov and his companies,

12   based on their promises, to solve what, for most of these

13   people was the most serious problems that they had ever

14   encountered in their lives, and with the most serious

15   consequences that they ever confronted in their lives, being

16   thrown out of their homes and losing whatever investment they

17   thought they were originally making and in desperate straits,

18   to try to figure out how they could save their homes or even

19   locate another place to live.

20             And I think the evidence in this case was clearly

21   significant to demonstrate that many of these victims were

22   desperately seeking help from Mr. Khafizov and from his company

23   because they just could see no way out of the most serious

24   problems that they ever had, some of them.  So I think that

25   that's an appropriate enhancement.

E3JPKHAS

1          With regard to the loss amount and the number of

2     victims, I'm going to stick with my calculation.  I'm totally

3     confident, without making any further calculation of the

4     numbers that are, obviously, supported by both the testimony of

5     witnesses and interview of the victims, I think that that

6     clearly indicates victims way over 50, and I would say that

7     clearly at least somewhere in the 200 and very possibly

8     significantly greater than that, but I think on this record, I

9     think that it is sufficient and the record is clear and strong

10     that at least these numbers were clearly demonstrated by

11     interviews and/or the witnesses.

12          And I think that the numbers in excess of 200 are

13     clearly demonstrated, but I am not going to go beyond that to

14     make an assessment of whether each person who was a customer

15     was, in fact, quote, a victim and whether or not, in fact, they

16     suffered a loss or received any particular benefit from their

17     contact with this company and Mr. Khafizov.

18          Also, with regard to the loss amount, I think the loss

19     amount is clearly way over 200,000.  I think that it's possibly

20     as high or higher than the government has indicated, based on

21     their calculations, but I think the record, as I say, is clear

22     here that, at least corresponding with the number of victims,

23     that I think the evidence clearly shows there were at least

24     references to Khafizov's criminal conduct consistent with those

25     numbers.

1            I think, you know, some number that reflects those

2    numbers of victims is appropriate, and I think that number is

3    over $200,000 and it's probably at least closer to the

4    $400,000, and as I say, very possibly, based on the

5    government's reasonable calculations, significantly higher than

6    that.  But I think it's consistent with the determination of

7    the lay witnesses and with the interviews of victims and the

8    documents that were clearly expended and the loss amount that

9    correspond to those numbers, I will make that adjustment in the

10   guideline range.

11           That being said, that would be, as it's indicated, the

12   12-point adjustment for loss amount instead of a 14-point

13   adjustment, a four-point adjustment for number of victims

14   instead of a six-point adjustment.

15           The government has conceded that they are withdrawing

16   and not going to seek an adjustment for misrepresentation of a

17   transaction enacted on behalf of a government entity, for abuse

18   of position of trust.  Each of those were two-point

19   enhancements, and so that would be adjusted.

20           So given that, that would be an eight-point adjustment

21   to the guideline range, taking the offense level from a level

22   37 to a level 29, for a guideline range of 87 to 108 months.  I

23   think that that is commensurate with the nature of this

24   offense, and that it does not overstate the conduct that was

25   proven at trial.  So that, I'm going to adjust the guideline

E3JPKHAS

1    range to that number.

2            And let's go to the sentence.  Does the government

3    wish to be heard first on the sentence?

4            MS. FRIEDLANDER:  Yes, your Honor.  Thank you.

5            THE COURT:  Yes, Miss Friedlander.

6            MS. FRIEDLANDER:  The Court heard the trial evidence

7    and has read our sentencing submission, and so I will be brief.

8    I just want to make a few points.  The defense keeps asking you

9    to compare Mr. Khafizov to insider trading defendants.  Just

10   two quick points on that.  First, the Court, of course,

11   considers all the facts and circumstances of the case.

12           Your Honor knows the evidence in this case

13   particularly well because the Court sat through a two-week long

14   trial, and so I think you hardly need me to tell you that this

15   defendant is not like an insider trading defendant in many ways

16   especially because this defendant preyed on people in a very

17   personal way.  The more victims trusted him, the more he came

18   back to them.  He came back to them for more money by telling

19   them more lies.

20           You remember Mary Lou Perez, who testified at this

21   trial.  She was the nurse in the neonatal ICU at St. Barnabas

22   Hospital in the Bronx.  She called him when she got default

23   notices, foreclosure notices.  Isaac Khafizov told her just

24   ignore them, and then he used the opportunity to trick her into

25   paying more money.  She got a summons to go to court with

E3JPKHAS

1    respect to her foreclosure.  She called him frantically.  He

2    told her not to go to court.  Again, he used the opportunity to

3    trick her into paying him more money.  That is not what insider

4    trader defendants do.  That is not what JP Morgan did when it

5    failed to deal with Bernie Madoff.

6            The fact that this defendant preyed on struggling and

7    vulnerable people is an important factor, in the government's

8    view, for the Court to consider in sentencing this defendant.

9            Mr. Kousouros, a few moments ago, said that this was

10   just a fraud where the defendant overpromised and

11   under-delivered, and I have to confess, I wondered if we sat

12   through the same trial when he said that.  As the Court will

13   recall, after American Home Recovery collapsed, after Isaac

14   Khafizov parted ways with the Cassuto brothers, Isaac Khafizov

15   ramped up his fraud.

16           Overpromised and under-delivered?  Isaac Khafizov

17   stole money outride from Bob McCarthy's bank account.  Isaac

18   Khafizov told Pankaj Singh that he needed an upfront fee of

19   nearly $1,300 for appraisal costs.  That was just false.  Isaac

20   Khafizov told Charles Decker that he was on the phone with

21   Mr. Decker's bank, and that the bank had approved the

22   modification and just needed an extra $2,000, which Isaac

23   Khafizov would gladly forward onto the bank if Mr. Decker would

24   send it to him, and Mr. Decker did that.  And that was a total

25   lie.

E3JPKHAS

1          Isaac Khafizov promised victim after victim that he

2     was doing things on their behalf that were just lies, and he

3     did it all to get more money from them.  And as the Court will

4     recall, he used that money to pay off his Mercedes and to drive

5     his fancy Cadillac Escalade.  And he committed this crime, in

6     sum, just out of pure greed.  So I think the Court should

7     reject the argument that this is just a fraud where the

8     defendant overpromised and under-delivered.  Thank you.

9          THE COURT:  Mr. Kousouros?

10         MR. KOUSOUROS:  What I said was that in this industry

11    and several other industries, the advertising pitches were to

12    overpromise and then try to deliver, try to come through in

13    order for the businesses to come through.  I was at the same

14    trial, and it was as troubling for me in many ways, Judge, and

15    for many reasons.

16         You do need to think about Mary Lou Perez.  You do

17    need to think about the witnesses that testified.  That's part

18    of why we're here.  And, you know, we've talked about the

19    guidelines and all of these numerical calculations, and now,

20    you also need to think about who this young fellow is.  We're

21    not talking about, you know, discounting a fine.  We're not

22    talking about small numbers here.  There will be punishment in

23    this case.

24         You will consider the victims.  You will consider the

25    offense, and oftentimes the government wants you to only

E3JPKHAS

1   consider that.  But that's not what we're here for.  We have

2   not asked you for a pass.  We've asked you for what is

3   sufficient but not greater than necessary.

4           These comparisons, they're insulting.  JP Morgan looks

5   away at what Madoff does.  Madoff cripples people with a

6   $100 billion loss.  JP Morgan and its executives get a deferred

7   prosecution.  If they prosecuted that case in front of this

8   honorable Court, oh, my goodness, would you be hearing about

9   those poor victims.  If they prosecuted insider trading case

10  before this honorable Court, oh, my goodness, would you be

11  hearing about the havoc upon the little guy.

12          But we've cited other cases.  But, guess what?  He did

13  wrong, and we want you to consider that.  But to speak from one

14  side in one case and then ask for a 13-year sentence or an

15  11-year sentence for a kid who's good at his core but just went

16  bad for a year, for whatever reasons, and then to say that's

17  not an insider trading case, that's not right either.

18          Now, I will also say, Judge, I was looking at 17-year

19  guidelines when I sent you that list.  So I understand that the

20  numbers have gone down, but to say that other people aren't

21  victimized in those cases, it's wrong, and you'll never hear it

22  if you're presiding over those cases.  That was my only point

23  in sending it to you, and again, I had 17-year guidelines,

24  which really scared me because that happens to be a human

25  being, as are the victims.  Don't ever let anything I say to

1    you signify that you shouldn't be thinking about them and,

2    believe me, I know you will.

3            I'm the only person that's going to talk to you,

4    besides him, that has spent any time with him, that knows more

5    than just the numbers.  And I'm going to do my best here, and I

6    want you to ask for any information you need because I really

7    need to know that I'm telling you everything you need to know,

8    because this is the only time that he really gets to at least

9    present who he was and who he is and who he can be so you can

10   figure out what we, as a society, need to take with him, and

11   you need to take something from him.

12           He was a good kid.  His family brought him here at age

13   five from Russia to flee from persecution, and they raised him

14   right, and he should be ashamed of himself, and he gets it.

15   His mother and father are here, and they were here every day at

16   trial.  He worked from 14 years old with his dad, who's a

17   haircutter, and he was selling the lotions and the shampoos in

18   that place when he was in college when the Cassutos came and

19   said, What are you doing this for? He took the bait.  He'll

20   pay for it.  He's been paying for it, but he was a good kid.

21           He helped his family.  He went to school, never did

22   anything, never ran afoul of the law.  He's what we want when

23   we raise our kids.  And so he got driven around in the

24   expensive cars that, Ms. Friedlander is right, he was an idiot

25   and went and bought for himself.  We get all of that, but kids

E3JPKHAS

make mistakes.  They go the wrong way, and then they get

carried away.  And guess what?  They pay.  But he was a good

kid.

          And aren't we trying to figure out what a defendant is

at his core?  Because isn't that what is at least going to tell

us how much time you need to give him, and what's going to come

of him when he gets out because it's the core we hope reemerges

in an individual?  That's what he was.  And he was 20, or 18,

he was young.  He wasn't a bad guy his whole life.  He wasn't

some criminal who we just know is going to do it again.  He was

a good kid.

          He started making money with these guys.  And what did

he do with the money?  His father was in financial distress.

He helped him.  He helped his parents buy a house.  You know,

this is an important thing.  You did not hear one shred of

evidence about what this guy did when he was making a lot of

money.  His car, his houses, he didn't have any of that when he

was working in the mortgage industry.

          He became more of a moron when he entered the

modification industry, when he wasn't making any money.  His

company went broke, but he helped his parents buy a house, a

house they lost to foreclosure.  He helped his brother.  He

tried to get his father out of debt.  He paid a lot of his

debt.  You didn't hear of him squandering money on his own

stuff before this.  He was a good kid.  And now he's a broken

1    man.  And he can emerge with his core.

2           You know, I don't even know if I can get through the

3    next part of this because it just, it cripples me.  That's his

4    wife.  And it's sad because he loves her to no end, and he's

5    losing her.  And through all the trial prep, I can't tell you

6    what they went through.  She was pregnant, coming to the office

7    every day, out to here.  You remember we started -- we were

8    going to start the trial.  The two weeks before, they find out

9    the baby is not going to survive, and it's a horrendous

10   procedure.

11          He's known her since he's 12.  Is that why maybe he

12   didn't listen and went to trial?  I don't know.  And now

13   they're falling apart.  He's absolutely crushed, and still, he

14   takes classes in jail.  He does what he can.  He does

15   everything he can to better himself, and he does.  He's

16   punished.

17          It is a sad case because this is a guy, he's a young

18   guy, who didn't need to go wrong.  And if he didn't, he'd be

19   successful because he does have the gift of gab when he's got

20   the fortitude and the confidence to talk.  And it's a shame.

21          So I do respectfully urge you, as I know you will, to

22   consider the victims, and some of it was really sad.  I'm also

23   going to ask you to, and I know you will.  He's not responsible

24   for all of their distress.  Many of them put themselves in a

25   bad place.  He didn't need to be there.

E3JPKHAS

1          But, Judge, I'm asking you, as well, to consider who

2      he was.  You've heard nothing to the contrary and know that has

3      been going on, you know, for four years.  It's taken a chunk of

4      his life, and to just, hopefully, get from it that when he

5      reemerges, and he will, what is inside him will come back out.

6      This is not a bad guy that we need to be scared of, and I am

7      telling you this is not a bad guy that we'll worry is ever

8      going to crush himself again in terms of recidivism.

9          Part of this was to talk to you about all the letters

10     you got.  I'm not going to do that.  They speak for themselves.

11     They say what I think I've hoped to convince you and that is,

12     he was a good kid.  Even while going through this, this young

13     fellow over here had some real issues, and even while he was

14     going through all this, he helped him through it.  And this

15     young fellow credits Isaac with that help.  So I did get

16     through it.

17         I can't imagine this is an easy task.  I'm asking you,

18     respectfully, to take your new guidelines which, believe me,

19     I'm very grateful for, the old ones were terrifying, and to

20     sentence him accordingly, based on what he did, who he did it

21     to, balanced with who he was and who he can be.  Thank you,

22     Judge.

23         THE COURT:  Yes, Ms. Friedlander?

24         MS. FRIEDLANDER:  May I be heard just briefly on one

25     point, your Honor?

E3JPKHAS

1        THE COURT:  Yes.

2        MS. FRIEDLANDER:  Mr. Kousouros described the

3   defendant as a great kid and said that the Court didn't hear

4   any evidence that he had engaged in any other bad conduct prior

5   to the time he engaged in this scheme.  We had evidence that

6   Mr. Khafizov engaged in mortgage fraud for years before he

7   started engaging in this scheme, and just to remind the Court,

8   we moved in limine to admit that evidence at trial.  The Court,

9   for a number of reasons, precluded it, but certainly we do not

10  agree that this was a defendant who had not engaged in prior

11  criminal activity.

12       We're not asking for a Fatico hearing on this issue,

13  and we're not asking the Court to take our word, you know, to

14  consider what we're telling you in determining the sentence.  I

15  simply want to state for the record that we disagree with what

16  Mr. Kousouros said, and we don't think that there is a basis

17  for the Court to conclude, simply based on Mr. Kousouros'

18  assertion, that this defendant has not previously engaged in

19  criminal activity.

20       THE COURT:  The only question I had, Mr. Kousouros,

21  did you want to be heard any further at sidebar?

22       MR. KOUSOUROS:  Yes.

23       THE COURT:  Why don't you come up here.

24       MR. KOUSOUROS:  Thank you, Judge.

25       (Pages 40 - 48 SEALED by order of the Court)

E3JPKHAS

1              (In open court)

2              THE COURT:  Mr. Khafizov, is there anything you want

3      to say before I impose sentence?

4              THE DEFENDANT:  Yes, sir.  Your Honor, thank you so

5      much for giving me a chance to speak.  I really want to talk

6      from my heart.  I don't have much prepared, but I just want to

7      say that I'm not a bad person.  I wasn't raised in a bad house.

8      I was not raised -- I was raised with morals.  I was raised by

9      doing the right thing in my life, going to school and always

10     tried to be successful and tried to do the right thing for

11     people.  I always tried my best to do the right thing for

12     everybody.

13             I've always worked since I was a teenager, to help my

14     parents.  You know, the year that we came here, they were short

15     on finances; so I tried to do as much as I can to help them.  I

16     wanted to go to school.  I started college.  I was going to go

17     to law school.  And when I was around 18 years old,

18     unfortunately, I meet these two guys that were twice my age and

19     promised me the world, told me things that, you know, I'll be

20     able to help my family, to help my parents, show me a better

21     life, a life that I never had.

22             So I -- you know, I listened to what they had to say,

23     and I tried to make the right decision, but that was really the

24     worst decision of my life.  They showed me a totally different

25     type of lifestyle with nice cars and houses and told me that

E3JPKHAS

all that could be mine.  You know, I took them up on their
offer.  It was really the worst mistake of my life.

       I had nothing but regret so much.  My family suffered
so much.  People suffered so much.  These victims suffered.  My
wife has suffered so much.  All I ever wanted was to have a
better life, a family, and married to my wife, to always have
children, raise them right.  I wanted to get married to the
girl I loved all my life, since 12 years old.  The next
morning, I got arrested by federal agents, right in front of
her.  I didn't know what to say or do.

       It has been the hardest thing for me ever since.  When
I found out she was pregnant, it was the best day of my life.
It was so hard to go through everything.  When I found out that
the baby was sick, I didn't know what to do or what to say.  I
just remember sitting at night, holding her, trying to tell her
that everything was going to be okay, but not knowing what to
say.  Two weeks before the trial, we were in the hospital and
the doctor said the baby is not going to make it; so we had to
get a termination done.  The baby had a heart problem.  Sorry.
I'm sorry.

       I'm so sorry for everything.  I'm so sorry to
everybody, the victims, my family, my wife.  I'm losing the
best thing that ever happened to me too.  I hope -- I hope that
I could go back out and show everybody that I'm a good person.
I'm not a bad person.  I'm really not.  I'm not.  I'm sorry.

E3JPKHAS

1    Sorry.  Thank you so much.

2              THE COURT:  I've reviewed the presentence report.  I

3    accept the factual recitations in the presentence report, and

4    I've adjusted the guideline range to a total offense level of

5    29, a criminal history category I.  I have considered the

6    submissions on behalf of the defendant and the government and

7    the arguments made by both sides with regard to sentence,

8    considering all the factors in 18 U.S.C. 3553(a) relevant to

9    sentence.

10             In this case, I sat through a trial which indicated

11   that there were, as we've already discussed, desperate people

12   who were looking for someone to assist them in their lives to

13   better their situation that they had no ability themselves to

14   resolve.  They reached out to this defendant.  This defendant

15   took advantage of every one of those individuals.  He showed a

16   callous disregard for the consequences of his criminal conduct

17   on the victims he swindled.  And even up through the trial,

18   this defendant demonstrated no acceptance of responsibility

19   until after he was not able to avoid conviction at that trial.

20             I've considered all of the other issues in mitigation,

21   those issues and a consideration of all the factors have

22   convinced me not to go above the guideline range.  Quite

23   frankly, I think it would be appropriate to go above the

24   guideline range.  I think this was a most serious crime, with

25   numerous victims who suffered severely and dearly as a result

E3JPKHAS

1    of the defendant's own decision to put his interests in front

2    of theirs.

3          But I've decided not to go above the guideline range

4    in this case because I believe a sentence within the guideline

5    range, with a sentence at the top of the guideline range, is an

6    appropriate sentence in this case, given the serious nature of

7    the crime involved here and the serious consequences to

8    numerous victims.

9          I am going to impose a sentence of 108 months.  I'm

10   going to impose three years of supervised release.  I'm going

11   to impose a $100 special assessment.  This sentence is imposed

12   on Counts One through Four, to run concurrently with each

13   other.

14         I will order restitution.  I'm going to order

15   restitution in the amount of just under $400,000 in this case,

16   given the acceptance of the loss amount was within that range

17   and the number of victims that were actually determined, and my

18   assessment that we'd be lucky if that amount of money could be

19   recovered from this defendant and distributed to victims.  Any

20   greater amount is unreasonable to expect that it is possible to

21   recover that amount for the victims to this case.  The money to

22   be distributed to the victims on the basis that the government

23   believes is appropriate, given the identification of the

24   available names.

25         The mandatory conditions of supervised release are

E3JPKHAS

1    imposed.   The defendant shall not commit another federal, state

2    or local crime.   The defendant shall not illegally possess a

3    controlled substance.   The defendant shall not possess a

4    firearm or destructive device.   The defendant shall cooperate

5    in the collection of any DNA as directed by the probation

6    officer.

7            The standard conditions of supervision one through 13,

8    as recommended by the presentence report, are also imposed.

9    The special condition, the defendant shall provide the

10   probation officer with access to any requested financial

11   information and shall not incur any new credit card charges or

12   open any additional lines of credit without the approval of the

13   probation officer unless the defendant is in compliance with

14   the installment payment schedule.

15           The defendant shall also participate in a drug or

16   alcohol program approved by the probation office, which program

17   may include testing to determine whether the defendant has

18   reverted to the use or abuse of drugs or alcohol.

19           The defendant is to report to the nearest probation

20   office within 72 hours of his release from custody.   The

21   restitution shall be made beginning 30 days after the defendant

22   is released from custody.   It shall be made in payments, in

23   monthly installments of at least 20 percent of the defendant's

24   gross monthly income over the period of supervision and to

25   commence 30 days after his release from custody, or any other

E3JPKHAS

1    schedule set by probation commensurate with his ability to pay

2    and the availability of funds.

3         Defendant shall notify the United States Attorney for

4    this district within 30 days of any change of mailing address

5    or residence address that occurs while any portion of the

6    restitution remains unpaid.

7         Mr. Khafizov, you have a right to appeal this

8    conviction of sentence.  If you wish to appeal any portion of

9    this conviction of sentence, you should discuss it immediately

10   with your attorney in order to preserve your right to appeal.

11   A notice of appeal must be filed on your behalf within 14 days

12   of entry of today's judgment.

13        Is there anything further by the government?

14        MR. VELAMOOR:  Just a few housekeeping matters.  The

15   Court indicated that it was ordering restitution in an amount

16   somewhat less than 400,000.  Is the Court willing to set a

17   specific number, since that's a range that I'm not sure that

18   might translate to the restitution people.

19        THE COURT:  It's going to be one dollar less than.

20        MR. VELAMOOR:  In the terms of special assessment, the

21   Court indicated $100 special assessment.  I believe there were

22   four counts of conviction.

23        THE COURT:  On each count, for a total of $400.

24        MR. VELAMOOR:  There's an underlying indictment, which

25   the government would move to dismiss.

E3JPKHAS

1          THE COURT:  That application is granted.

2          MR. VELAMOOR:  And, lastly, with respect to

3    forfeiture, we'd ask the Court to orally order forfeiture and,

4    as appropriate, the government will submit an order to the

5    Court after sharing it with Mr. Kousouros.

6          THE COURT:  And you want an order of forfeiture of the

7    same amount, or are you going to argue for --

8          MR. VELAMOOR:  Yes.  I think it's likely to be the

9    same amount, while we'll discuss it and share with

10   Mr. Kousouros and provide it to the Court.

11          THE COURT:  I will order forfeiture in that same

12   amount.  Anything further, Mr. Kousouros?

13          MR. KOUSOUROS:  Your Honor, just two things.  We would

14   ask for a designation close to the New York area, and as in our

15   submission, your Honor, there were significant issues with

16   respect to Mr. Khafizov's medicating for quite some time prior

17   to trial and actually leading up to trial.  We would ask that

18   your Honor recommend the drug program, if he's eligible.

19          THE COURT:  While he's incarcerated?

20          MR. KOUSOUROS:  Yes.

21          THE COURT:  Okay.  All right.  I have ordered that

22   during supervised release.  I will order that he participate in

23   the drug program, to the extent that he's, obviously, willing

24   to participate and be eligible for the program in the facility,

25   if he wishes.  I will recommend that he be housed at a facility

E3JPKHAS

1    closest to the New York City area.

2              MR. KOUSOUROS:  Thank you.

3              THE COURT:  That's the sentencing.

4              MR. VELAMOOR:  Thank you, your Honor.

5              MS. FRIEDLANDER:  Thank you.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25